Argued and submitted February 9, opinion of the Court of Appeals affirmed and case remanded May 24, 1983

# STATE OF OREGON,
*Petitioner on review,*

*v.*

# EUGENE STANLEY CARSEY,
*Respondent on review.*

## (CA A22361; SC 29083)

664 P2d 1085

────────────

William F. Gary, Solicitor General, Salem, argued the cause for petitioner on review. With him on the brief was Dave Frohnmayer, Attorney General, Salem.

Warren John West, Bend, argued the cause and filed a response to the petition for respondent on review. On the brief was Richard E. Forcum, Bend.

Before Lent, Chief Justice, and Peterson, Campbell, Roberts,* * Carson, and Jones, Justices.

PETERSON, J.

────────────

* * Roberts, J., did not participate in the decision of this case.

## PETERSON, J.

This is a Fourth Amendment search case[1] in which the defendant's grandmother gave the police consent to search the defendant's room in her home. The trial court found that the defendant "had exclusive control over his room" and held that the grandmother's consent "was unauthorized because defendant had exclusive control over his bedroom and had a reasonable subjective expectation of privacy." Even so, the trial court denied the defendant's motion to suppress because the police had "a good faith objective and reasonable belief that the grandmother had authority to consent." The Court of Appeals reversed the trial court's order denying suppression. *State v. Carsey,* 59 Or App 225, 650 P2d 987 (1982). This case squarely presents two questions: (1) whether a police search of a child's room, made pursuant to the consent of a parent, is, as a matter of law, permissible, and (2) where police conduct an otherwise illegal search of the defendant's room pursuant to consent obtained from a third person, is the search legal if the searching officers reasonably believed that the third person had sufficient authority over the premises to consent to the search?

In a trial to the court, defendant was convicted of possession of a controlled substance.[2] The controlled substance,

---

[1] As we have often stated, we normally consider Oregon constitutional questions before any federal constitutional question because the state does not deny any right claimed under the federal constitution when the claim before the court is fully met by state law. *Sterling v. Cupp,* 290 Or 611, 614 & n 2, 625 P2d 123 (1981); *State v. Scharf,* 288 Or 451, 454-55, 605 P2d 690 (1980). We would do so in this case if the case had not been briefed and argued under the federal constitution and the defendant had claimed that his rights under the state constitution are different from and greater than his rights under the federal counterpart. Not having been raised, however, and because we agree with the Court of Appeals that the defendant's Fourth Amendment rights were violated, it is unnecessary for us to consider whether the defendant is entitled to greater protection under Article I, section 9, of the Constitution of Oregon, which provides:

"No law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure; and no warrant shall issue but upon probable cause, supported by oath, or affirmation, and particularly describing the place to be searched, and the person or thing to be seized."

[2] The indictment charges that the defendant "* * * on or about the 3rd day of April, 1981, in Deschutes County, Oregon did unlawfully and knowingly possess a controlled substance, to-wit: Marijuana, in a quantity greater than one ounce." *See* ORS 475.992(4). Although the defendant was originally also indicted on a charge of theft in the first degree (stereo equipment), that charge was ultimately dismissed.

marijuana, was found during a search of the defendant's bedroom in his grandmother's house. On appeal the defendant assigned as error the trial court's denial of his motion to suppress evidence.

At the time of the challenged search the defendant, although 19 years old, was living with his grandparents. As a juvenile, he had been found to be within the jurisdiction of the juvenile court as provided in ORS 419.476(1)[3] and had been committed to the MacLaren School for Boys pursuant to ORS 419.507(1) and ORS 419.509(1).[4] When his commitment to the MacLaren School ended, he went to Project Picture in Portland. Project Picture is referred to as a "halfway house" in the record, but its legal status is unclear. In February, 1981, he was released on parole to his grandparents pursuant to ORS 420.045(1).[5] Custody over the defendant after release appears

---

[3] ORS 419.476(1) provides, in relevant part:

"The juvenile court has exclusive original jurisdiction in any case involving a person who is under 18 years of age and:

"(a) Who has committed an act which is a violation, or which if done by an adult would constitute a violation, of a law or ordinance of the United States or a State, county, or city."

[4] ORS 419.507(1) provides:

"A child found to be within the jurisdiction of the court as provided in ORS 419.476(1), may be made a ward of the court. Where a child has been found to be within its jurisdiction, and when the court determines it would be in the best interest and welfare of the child, the court may:

"* * * * *.

"(b) Place the child in the legal custody of the Children's Services Division for care, placement and supervision."

ORS 419.509(1) provides, in relevant part:

"A child placed in the legal custody of the Children's Services Division shall be placed in a juvenile training school * * * in the following cases and no other:

"(a) The child is found to be within the jurisdiction of the juvenile court by reason of a ground set forth in ORS 419.476(1)(a); and

"(b) the juvenile court having jurisdiction so orders."

ORS 420.005(3) provides, in part, " 'Juvenile training schools' means * * * the MacLaren School for Boys."

[5] ORS 420.045(1) provides:

"(1) Upon finding that a student of a juvenile training school is ready for release therefrom and that he had best be returned to his parent or guardian or to a suitable and desirable home or facility, the Assistant Director for Children's Services or his authorized representative, may, after advising the committing court, release the student on parole conditioned upon good behavior."

to have been in the defendant's grandparents pursuant to a release agreement and ORS 420.031(2).[6]

■ The state argues that because of the grandmother's legal relationship to defendant and her responsibility for defendant's supervision and control, she had legal custody of the defendant and had the same relationship to the defendant as a parent to a minor child living at home. As did the Court of Appeals, 59 Or App at 231, we assume that the release agreement created the legal effect the state urges, and that the relationship between the grandmother and the grandson was essentially that of parent and child.

The trial court, in one of its findings, succinctly described the living arrangement between the defendant and his grandparents as follows:

> "* * * The Defendant occupied a bedroom in his grandparents' home for which he paid $60 per month as rent. He did his own cleaning and washing. His grandfather never went into his room. His grandmother never went into his room except to stick her head in and tell him that a meal was ready. She characterized the arrangement as an unspoken agreement that his room was under his exclusive control."

On April 3, 1981, Officer David Burleigh of the Bend Police Department called Bradley Mulvilhill, defendant's juvenile officer, and told him that he had reason to believe that the defendant had received stolen stereo equipment. Burleigh and Mulvilhill consulted with a deputy district attorney. There was a question whether the information was sufficient to obtain a valid search warrant. Burleigh and Mulvilhill decided to seek the consent of defendant's grandmother to a search of the defendant's bedroom. Mulvilhill telephoned the defendant's

---

[6] ORS 420.031(2) provides:

"* * * * *.

"(2) Upon parole of the person from a juvenile training school, the legal custody of the person is vested in his parents or other person to whom he is returned, subject to [a provision concerning parole revocation]."

*But see* ORS 419.507(3), which provides:

"The juvenile court shall retain wardship and the Children's Services Division shall retain legal custody of the child committed to it regardless of the physical replacement of the child by the Children's Services Division."

Further details concerning the release agreement are contained in the Court of Appeals opinion, 59 Or App at 227 n 2.

grandmother and asked if they could talk to her about the defendant. The defendant's grandmother agreed and the officers went to her house. Upon arrival, Burleigh told Mrs Carsey that they had reason to believe that the defendant had stolen stereo equipment in his room and asked to see the defendant's room. That was the extent of the discussion.[7] Mrs Carsey agreed and let them into the room. The officers discovered evidence in the room which defendant moved to suppress.

At the outset, we noted that this case involves the application of the Fourth Amendment of the Constitution of the United States. It provides:

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and

---

[7] Mulvilhill testified:

"Q What happened when you first arrived at that residence?

"A We knocked on the door and Mrs. Carsey came to the door and invited us in. And she then, of course, asked what matter we was there on and Officer Burleigh explained that he had reason to believe that Eugene had stolen stereo equipment in his room.

"Q All right. Do you recall exactly what was said from then on out?

"* * * * *.

"A To the best of my recollection, at that point in time Officer Burleigh asked if we could see the room and Mrs. Carsey said yes. And we started walking directly back to the door. Officer Burleigh followed her and I followed Officer Burleigh.

She opened the door. We went into the room and started looking over the room."

Officer Burleigh testified:

"Q Was there any discussion at that time as to obtaining the consent of Mrs. Carsey to search Eugene's room?

"A Yes. I believe we talked about that we would ask Mrs. Carsey if she would give us consent to search.

"* * * * *.

"Q I believe in your last response to counsel's question you indicated that you thought you had authority or that Mrs. Carsey had authority to consent to search. What questions did you ask of Mrs. Carsey relative to Eugene's bedroom and the situation within the residence?

"A The only thing I said to her was that I believed Eugene had purchased a stolen stereo.

"Q Did you ask any of the circumstances as to how Eugene happened to be living there and what the arrangements were within the residence?

"A No."

seizures, shall not be violated, and no Warrants shall issue, but upon probable *cause, supported* by *Oath or affirmation, and* particularly describing the place to be searched, and the persons or things to be seized."

Under the Fourth Amendment, a search without a warrant is unreasonable per se unless the search comes within one of the "few specifically established and well-delineated exceptions." *Katz v. United States,* 389 US 347, 357, 88 S Ct 507, 19 L Ed 2d 576, 585 (1967). There exist not less than three recognized exceptions to the Fourth Amendment search warrant requirement:

 1. Search incident to arrest;

 2. Search which is permitted because the circumstances then and there existing authorize, even demand, immediate responsive action by the police. This exception includes what has been variously described as an "exigent circumstances" exception, an "emergency" exception and a "hot pursuit" exception;

 3. Search pursuant to a lawful consent.[8]

One can waive one's Fourth Amendment rights. A search pursuant to a defendant's voluntary consent is constitutionally permissible. *Schneckloth v. Bustamonte,* 412 US 218, 222, 93 S Ct 2041, 36 L Ed 2d 854 (1973); *Katz v. United States,* 389 US 347, 358 n 22, 88 S Ct 507, 19 L Ed 2d 576, 586 n 22 (1967).

The Supreme Court has, on several occasions, upheld searches in which the police justified the search on the basis of consent obtained from one other than the defendant. In *Frazier v. Cupp,* 394 US 731, 740, 89 S Ct 1420, 22 L Ed 2d 684, 693-94 (1969), the court held that evidence seized from the defendant's duffel bag in a search consented to by the defendant's cousin, who had actual possession and control of the bag, was admissible. Because the cousin was a "joint user" of the bag, he had authority to consent to its search. 394 US at 740.

The "joint user" concept was refined and restated in *United States v. Matlock,* 415 US 164, 94 S Ct 988, 39 L Ed 2d 242 (1974). In that case there was evidence that the defendant

---

[8] The list is not intended to be exhaustive. *See, e.g., Terry v. Ohio,* 392 US 1, 88 S Ct 1868, 20 L Ed 2d 889 (1968).

was living with a woman, Mrs Graff, in a bedroom of her parents' home. Mrs Graff voluntarily consented to a search of the bedroom. The search turned up incriminating evidence which the defendant moved to suppress on the ground that Mrs Graff had no authority to consent to the search. The court held that if voluntary consent were obtained "from a third party who possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected," the warrantless search would be upheld. 415 US at 171. *Matlock* reflects a rejection of agency analyses in deciding the issue. The opinion contains this footnote 7:

> "Common authority is, of course, not to be implied from the mere property interest a third party has in the property. The authority which justifies the third-party consent does not rest upon the law of property, with its attendant historical and legal refinements, see Chapman v United States, 365 US 610, 5 L Ed 2d 828, 81 S Ct 776 (1961) (landlord could not validly consent to the search of a house he had rented to another), Stoner v California, 376 US 483, 11 L Ed 2d 856, 84 S Ct 889 (1964) (night hotel clerk could not validly consent to search of customer's room) *but rests rather on mutual use of the property by persons generally having joint access or control for most purposes,* so that it is reasonable to recognize that any of the coinhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched." 415 US at 171 n 7. (Emphasis added.)[9]

The state's first contention is that the grandmother was a custodian, guardian or functional equivalent of a parent, and as such had the responsibility to supervise and control her

---

[9] *But see Stoner v. California,* 376 US 483, 84 S Ct 889, 11 L Ed 2d 856 (1964), which involved the warrantless search of a defendant's hotel room, consented to by a desk clerk, the court stated:

> "Our decisions make clear that the rights protected by the Fourth Amendment are not to be eroded by strained applications of the law of agency or by unrealistic doctrines of 'apparent authority.' As this Court has said, 'it is unnecessary and ill-advised to import into the law surrounding the constitutional right to be free from unreasonable searches and seizures subtle distinctions, developed and refined by the common law in evolving the body of private property law which, more than almost any other branch of law, has been shaped by distinctions whose validity is largely historical. * * * [W]e ought not to bow to them in the fair administration of the criminal law. To do so would not comport with our justly proud claim of the procedural protections accorded to those charged with crime.' Jones v United States, 362 US 257, 266-267, 4 L ed 2d 697, 705, 706, 80 S Ct 725, 78 ALR2d 233."

ward, and that "[n]o matter how great the child's expectation of privacy * * * the parent retains the ultimate authority to enter the room or to permit others to do so for the purpose of carrying out parental authority." It argues:

> "* * * The Court of Appeals' opinion in this case holds that the supervisory responsibilities of a parent or guardian can be bargained away by agreement with the ward. This is an untenable proposition. The parent-child or guardian-ward relationship is not an equal partnership, the terms of which are established by legally enforceable, arm's length agreements. * * *
>
> "The defendant in this case was subject to the supervision and control of his grandmother. She had the inherent authority to consent to the search of his room. * * *"

The state cites *In Interest of Salyer,* 44 Ill App 3d 854, 358 NE2d 1333 (1977). In *Salyer,* the defendant, age 15, had taken his mother's car without permission and was apprehended by a policeman and taken to the County Detention Center. His mother, Mrs Salyer, informed the officer that she later found a bag in the back seat of the car, which she suspected contained marijuana. She asked the officer to obtain a search warrant to search her son's bedroom. The officer told her that a search warrant would not be necessary and had her sign a consent. The search of the defendant's room uncovered incriminating evidence which the trial court refused to suppress. We quote from the appellate court opinion:

> "The mother of respondent, Cheryl Salyer, confirmed in her testimony that the search of the bedroom occupied by her 15-year-old son was conducted without a search warrant but with her consent. She testified that she was a divorcee and considered herself the head of the household, consisting of herself, respondent and four other children. She testified that respondent was the only family member who had a bedroom occupied by him alone. She stated that he kept his room locked with a combination lock on the outside and an inside lock. As a result, it was necessary for Mrs. Salyer to knock to gain admittance to respondent's bedroom. Respondent cleaned his own room and brought his laundry out of the room. The only purpose for which his mother would normally enter the room would be to ask her son a question. She stated she had been in the room once or twice in the 3-month period preceding the search.

"Mrs. Salyer was paid support money by her ex-husband. She testified that, although there was no formal arrangement between her and the respondent for the payment of any rent, respondent did give her some money to pay utility bills or house rent, when she needed it and when respondent had it. He had given his mother about $200 for these purposes during the preceding summer. Respondent had his own spending money from a summer job and bought his own clothes and most of the furnishings in his bedroom. Mrs. Salyer testified that she had the only key to the house, since she had not 'gotten around' to having any other keys made. The respondent did not pay for food.

"Respondent testified that he kept his bedroom locked, and that the combination of the lock was known only to him. He had recorded the combination, among nine other false numbers, on a board above the door. In the month of April 1975, respondent and his mother had argued and his mother had ordered him to leave. He did so, but returned to his mother's house that same night. On the night preceding his early morning arrest, respondent had left his bedroom about 10:00 P.M. He stated that, to preclude having to turn on the light to reopen the bedroom lock and possibly disturbing his mother, he simply 'pushed up' the lock to make it appear locked, without actually locking it." 358 NE2d at 1334-35.

After stating the test that "common authority rests on mutual use of property by persons generally having joint access or control for most purposes so that it is reasonable to recognize that any of the co-inhabitants has the right to permit inspection in his own right, and that the others have assumed the risk that one of their number might permit the common area to be searched" the court held that the mother had "at least common authority as to the room." 358 NE2d at 1336. We quote from the opinion:

"We believe that there is implicit in the rights and duties imposed upon a parent, the right to exert parental authority and control over a minor son's surroundings and that such implied right to control obviously includes a room in the home of the mother. We also conclude that the mother had at least common authority as to the room occupied by her 15-year-old child. The record discloses that the son had been in the sole occupancy of the room from the time he was 10 years of age, and that the same or similar conduct or arrangements had been involved from that period until the time considered in the instant case. Also, we note as a distinctive element, that unlike the *Nunn* case [*People v. Nunn*, 55 Ill 2d 344, 304 NE2d 81

(1973)], there was no showing of any instruction to the mother to let no one else come into the room.

"We therefore conclude that in view of the age of the child involved, the mother had the right to waive the requirement of a search warrant of a room in her house occupied by her minor child of 15 years of age. In her distress, she had called for help from the police, in an effort to help control her child and prevent him from being involved in more serious problems. Can we say that a mother with a child of 10 or 11 or 12 or 13 or 14 or 15 has no authority over the room occupied by her child in her home? Can we say that the mother has no right to enter that room and to admit others to the room under facts such as we have in the present case? We believe that to come to that conclusion would be absurd and that a line should be drawn at some reasonable stage. It seems reasonable to adopt the standard set by the Illinois legislature, in declaring that a child of 18 is of age. The obligations of the parent continue so long as a child is a minor." 358 NE2d at 1336-37.

■ Cases involving consent obtained from parents or other relatives pose unique problems stemming from the fact that families ordinarily have common use of many household areas; that it is normal for the owner of a home to exercise control over all areas of the home, or if control is not actually exercised or is seldom exercised, that the right to exercise control over all areas exists; and that parents, by reason of the parent-child relationship, have a measure of control over all aspects of their childrens' lives, activities, effects, and living quarters. We are not prepared to hold (nor do we believe that the Illinois court necessarily so held) that the relation of parent and child, as a matter of law, in and of itself and in every case, necessarily creates the foundation for a valid consent search. In many, perhaps most, cases the facts would support such a finding. We do not read the *Salyer* case as going as far as the state contends. Unquestionably, the *defendant's* intention in *Salyer* was to create an area in his mother's home which was beyond her control and authority. Although the mother may have tolerated the arrangement for her own peace of mind, domestic harmony, or otherwise, toleration is not necessarily agreement. The trial court there found, unlike the case at bar, that the mother retained some use and authority over the defendant's room.

■ A parent has manifold duties toward his or her minor children, duties which give rise to correlative rights of control over the child. Although the constitutional rights of the child

must be considered in light of the historic parent-child relationship, a child's constitutional right to be free from unreasonable searches is not a right that comes into being only when the child attains majority. *Planned Parenthood of Missouri v. Danforth,* 428 US 52, 74, 96 S Ct 2831, 49 L Ed 2d 788, 808 (1976); *In re Scott K.,* 24 Cal 3d 395, 155 Cal Rptr 671, 595 P2d 105 (1979). Although the parent-child relationship is an important factor to be considered in determining the validity of the consent in a case in which the consent is obtained from a parent, the validity of consent involves consideration of other factors, an important one being the consenting parent's control over the premises for the search of which consent was given. *See* Annot., 4 ALR4th 196, § 3 at 212-15 (1981).

■ The Court of Appeals rejected the state's claim that the parent and child relationship, in and of itself, creates an unconditional right in a custodial parent to consent to the search of the child's room. 59 Or App at 231. We do so, as well. In so doing, however, we do not suggest that had the trial court upheld the search on the basis of a valid consent we would overturn that ruling. All we are saying is that there are facts which support the trial court's finding that the defendant "had exclusive control over his room." Under *Ball v. Gladden,* 250 Or 485, 487, 443 P2d 621 (1968), we are bound by those factual determinations.

*Matlock* footnote 14 is of particular significance to the second issue at bar:

> "Accordingly, we do not reach another major contention of the United States in bringing this case here: that the Government in any event had only to satisfy the District Court that the searching officers reasonably believed that Mrs. Graff had sufficient authority over the premises to consent to the search." 415 US at 177 n 14.

As stated in the first paragraph of this opinion, the trial court upheld the search despite the fact that a *Matlock* showing—mutual use of the property by persons having joint use, access or control for most purposes—had not been established. The trial court found no joint access or control, and held that the grandmother's consent was unauthorized. Even so, the evidence was admitted because the trial court found that the

searching officers had "a good faith objective and reasonable belief that the grandmother had authority to consent."[10]

Our analysis begins with the Fourth Amendment itself, which defines a *right*, "the right of the people to be secure in their * * * houses * * * against unreasonable searches * * *." Had the police entered the defendant's room with no consent from anyone, there could be no question that the right to be free from an unreasonable search would have been violated, the search would be improper and the evidence would be suppressed.

The *Matlock* rule rests upon the premise that one who jointly occupies premises assumes the risk that the co-occupant "might permit the common area to be searched." *Matlock,* 415 US at 171 n 7, quoted above. On the Fourth Amendment issue, we are, of course, bound by the *Matlock* rule. The state is really seeking an entirely new, sweeping exception to the warrant requirement. Stated in its broadest sense, the exception would validate an illegal search if the police had reasonable "good faith." Stated in its most limited sense and limited to this case, the exception would authorize warrantless searches if (a) consent is first obtained from a third person, and (b) the police had a good faith reasonable belief that the person giving consent was authorized to do so. An ignorance is bliss exception.

It must be kept in mind that the consent exception is just that—an exception—an exception perched upon the existence of commonality of use, control or occupancy of the searched premises. As stated, consent of a person who under *Matlock* has no status as a common occupant is, in effect, no consent at all. Such an entry, so far as the defendant is concerned, is identical to an entry in which no consent had been obtained. The defendant's expectation of privacy is the same and the interference with the defendant's privacy is identical in both cases. The critical factor in the analysis is that the "consent exception" rests upon the premise stated in *Matlock's* footnote 7, quoted above. The *Matlock* exception is not a *good faith* exception to the warrant requirement; it is a *consent* exception resting upon the assumption that joint use or occupancy of the

---

[10] The trial court's findings of fact are set forth in full in the Court of Appeals opinion, 59 Or App at 228-29.

premises by the consenting party creates a species of assumption of risk by the defendant that the cotenant might permit the common area to be searched. 415 US at 171. The Fourth Amendment unquestionably affects police conduct; but it was not enacted for the primary purpose of encouraging police to act in good faith. It was enacted to protect people in their homes against unreasonable, warrantless searches. The exception proposed by the state would engorge the constitutional right.

Had the police asked the defendant's grandmother and learned that she and the defendant had no "joint access or control for most purposes," the subjective good faith belief that they could make the search if she consented should not avail them, for the factual *Matlock* foundation is lacking. We see no reason for a different result if the police do not ask and proceed upon good faith born of and borne by innocent or deliberate ignorance. Indeed, upholding searches such as this, based upon the subjective good faith of the searching officers, might encourage police to obtain as little pre-search information as possible concerning the consenting party's relationship to the defendant and to their common use, access, or control of the premises to be searched.

The state cites *United States v. Peterson,* 524 F2d 167 (4th Cir 1975), and *Hayes v. Cady,* 500 F2d 1212 (7th Cir 1974), in support of the proposition that the evidence should not be suppressed if the police "in good faith, believed that the third party had the actual authority to permit the search." Those cases do not support the proposition. Although *Peterson* refers to the good faith of the officers, 524 F2d at 180, the court was of the opinion that Mrs Peterson had joint control of the bedroom. Had the appellate court been deciding the question (the trial court had suppressed the evidence as against Mrs Peterson's son), it would have "concluded the search valid as to Stanley Peterson." 524 F2d at 179. In *Hayes v. Cady, supra,* the defendant disclaimed any interest in the searched room.

We find little or no federal authority supporting the state's position. There are, however, some state cases which support the state's position. *See, e.g., People v. Gorg,* 45 Cal 2d 776, 291 P2d 469 (1955).

The good faith of the searching officers in relying upon the consent of a third person whose access, control or use of the premises is not joint or coextensive with that of the defendant is

irrelevant. In effect, such an entry is an entry with no consent at all, and therefore unreasonable under the Fourth Amendment. *Cf. State v. Tourtillott,* 289 Or 845, 868, 618 P2d 423 (1980), ("We do not consider the subjective good faith of the officer in considering the reasonableness of searches and seizures").

This result is consistent with *Matlock* and the reasons which underlie *Matlock.* The rule is not difficult for police to understand, follow, and apply. Before police can search premises in reliance upon the consent of a third person, they should ascertain that the defendant and the consenting party have a common use, access, or control of the premises to be searched. If they fail to inquire and it later develops that there was no joint use, access, or control, the subjective good faith of the police will be of no effect. Moreover, if the police inquire as to such uses before the search is made, later collusive efforts of the defendant and consenting party to claim there was no joint access, use, or control will be less likely to succeed.[11]

We therefore affirm the Court of Appeals, although on different grounds. The trial court's finding that there was no mutual use or control over the room forecloses the validation of the search on a *Matlock* analysis. Neither the bare good faith of the police officers nor the consent of a parent, by itself, validates an otherwise unlawful search.

The Court of Appeals is affirmed and the case is remanded to the trial court for a new trial.

---

[11] This case does not directly involve the issue now pending before the Supreme Court of the United States—whether the exclusionary rule should apply to an illegal search if the police are acting in good faith pursuant to a search warrant. *See People v. Gates,* 85 Ill 2d 376, 423 NE2d 887, (1981), *cert granted sub nom Illinois v. Gates,* 454 US 1140, 102 S Ct 997, 71 L Ed 2d 291 (1982).