Submitted July 30, reversed and remanded December 3, 2014,
petition for review allowed April 9, 2015 (357 Or 143)

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

LINDA JEAN BONILLA,
*Defendant-Appellant.*

Douglas County Circuit Court
11CR2221FE; A153808

341 P3d 751

Peter Gartlan, Chief Defender, and Rond Chananudech, Deputy Public Defender, Office of Public Defense Services, filed the brief for appellant.

Ellen F. Rosenblum, Attorney General, Anna M. Joyce, Solicitor General, and Pamela J. Walsh, Assistant Attorney General, filed the brief for respondent.

Before Duncan, Presiding Judge, and Haselton, Chief Judge, and Lagesen, Judge.

HASELTON, C. J.

## HASELTON, C. J.

After a jury trial, defendant was convicted of unlawful possession of methamphetamine, ORS 475.894. On appeal, she contends that the trial court erred in denying her motion to suppress evidence found as the result of a warrantless search of a bedroom that she shared with her mother. Specifically, defendant argues that (1) her brother lacked actual authority to allow officers access to the door of the apartment that defendant shared with others; and (2) her mother lacked actual authority to consent to the search of certain items in their shared bedroom, including a wooden box that contained the methamphetamine. As explained below, we need not address defendant's first argument because, even assuming without deciding that her brother had actual authority to give the police access to the door of the apartment, defendant's mother lacked actual authority to consent to a search of the wooden box. Consequently, the trial court erred in denying defendant's motion to suppress the methamphetamine and derivative evidence. We reverse and remand.

The material facts are uncontroverted. In September 2011, Parole and Probation Officer Sparks and Douglas County Sheriff's Deputy Scriven went to the listed address of a parolee, Fleshman, to perform a home visit after receiving a report of drug activity. The listed property consisted of two separate buildings: a main single-family home and a free-standing garage in the back, a part of which had been converted into a second living area. Defendant's brother, Dabbs, lived in the main house. Fleshman and his girlfriend, Crowe (who is defendant's niece), lived in the converted garage with defendant and defendant's mother, Bull. Dabbs, Bull, and Dabbs's father-in-law were buying the entire property, which consisted of both the main house and the converted garage.

Once at the property, the officers went to the front door of the main home, and Dabbs informed them that Fleshman lived in the back in a converted garage but that he was not currently there because he was in the process of moving. The officers asked if Crowe (Fleshman's live-in girlfriend) was there, and Dabbs took the officers to the converted garage to speak to her.

When Dabbs and the officers reached the converted garage, the exterior door was open, and "there was just kind of an open entryway where there was some tools and stuff stored and then there was an interior door that was closed." Scriven asked Dabbs if the officers could enter through that first door into the storage area, and Dabbs responded, "Yes." The officers then followed Dabbs into the storage area, and, once inside, Dabbs knocked on a second door, which was located a few feet from the first door.[1] Crowe opened the second door, and Dabbs entered, leaving the door open behind him. From where the officers were standing—on the storage area side of the threshold—they saw Crowe inside a living room and detected an "overwhelming odor of marijuana." Dabbs told Crowe that the officers were looking for Fleshman. Crowe then told the officers that they could come in, and Dabbs left.

Once inside the living room, the officers spoke with Crowe, while defendant, who was also in the room, remained seated in a recliner. Crowe told the officers that she and Fleshman were in the process of moving to another residence. When asked about the odor of marijuana, Crowe responded that it was probably associated with her 88-year-old grandmother, Bull, who was in a bedroom at the back of the apartment. Scriven asked Crowe for consent to go to the bedroom, and Crowe agreed, leading the officer down a small hallway to the bedroom where Bull was located. Sparks stayed in the living room with defendant.

The bedroom door was closed, but Crowe opened the door and introduced Scriven to Bull, who was sitting in a recliner in a "little makeshift room with one single bed and one recliner and then a TV and *** some sort of place to hang some clothes." Crowe stated, "This is my grandmother. This is her bedroom." Crowe then returned to the living room. Scriven asked Bull about the smell of marijuana and about the "marijuana pipes" that were located next to her. Bull admitted to having marijuana and gave Scriven a bag of it.

Scriven then asked Bull if he could check the room to make sure there were no more drugs, and Bull replied,

---

[1] When asked at the suppression hearing whether he had "any particular authority over the residence," Dabbs responded that he did not.

"Sure." Next to the bed, there was a nightstand and a headboard; near there, Scriven found a brown wooden box and opened it.[2] Inside the box were "three clear plastic baggies with a white crystal residue." Scriven asked Bull if the substance belonged to her, and Bull replied that it must belong to her daughter, defendant. Scriven then asked Bull why defendant's belongings would be in the bedroom, and Bull replied that she and defendant "share[d] a bed together"—and identified defendant as the woman sitting in the recliner in the living room.

At that point, Scriven stopped his search of the bedroom and went back to the living room to speak with defendant. Scriven asked defendant where she slept, and she responded that she slept in the back bedroom and shared a bed with her mother, Bull. Scriven then told defendant that Bull had consented to a search and that, during that search, he had found methamphetamine. Defendant told him that the baggies of methamphetamine belonged to her. Scriven explained that, because defendant was "staying back there too," he needed her permission to search the bedroom. Defendant consented, and, during the second search, Scriven found some "snort tubes" with "white crystalline residue inside the tubes."

After being charged with unlawful possession of methamphetamine, defendant moved to suppress all of the evidence obtained as a result of the search, arguing that the officers did not have actual authority to perform a warrantless search. The trial court denied that motion, determining that the officers had lawfully entered the converted garage and that they "were given permission to [go] into that residence," *viz.*, the apartment, by Crowe. The court further found that Bull gave Scriven consent to look in the bedroom and that "there wasn't any prior indication that anyone else lived in that room besides * * * Bull until * * * Bull herself said to the deputy that she shared that room with [defendant]." Given the denial of suppression, the state at trial introduced the three baggies found inside the wooden box

---

[2] It is not clear from the record whether the wooden box was located on top of the nightstand, on the headboard, or on the floor. However, that factual uncertainty does not alter our analysis.

and the "snort tubes," which contained methamphetamine. Ultimately, a jury found defendant guilty of unlawful possession of methamphetamine.

On appeal, defendant essentially reiterates her position before the trial court, invoking Article I, section 9, of the Oregon Constitution and the Fourth Amendment to the United States Constitution.[3] Specifically, defendant contends that Dabbs did not have actual authority to consent to the officers' entry into the storage area of the converted garage. Defendant further argues that, in all events, Bull had no actual authority to consent to a search of defendant's personal property—the wooden box—in their shared bedroom.[4] As explained below, we need not address defendant's first argument because we agree with her second.

Under Article I, section 9, a warrantless search is *per se* unreasonable unless it falls within an established exception. *State v. Fuller*, 158 Or App 501, 505, 976 P2d 1137 (1999). Voluntary consent is one of the recognized exceptions to that rule and may be given by a "person with the *actual* authority to do so." *Id.* (emphasis added). "Whether the third party had actual authority involves a resolution of factual issues, but the question of whether a person ha[d] actual authority at the time consent is given is ultimately a question of law." *State v. Surface/Hurley*, 183 Or App 368, 372-73, 51 P3d 713 (2002) (internal quotation marks and citations

---

[3] Article I, section 9, provides:

"No law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure; and no warrant shall issue but upon probable cause, supported by oath, or affirmation, and particularly describing the place to be searched, and the person or thing to be seized."

The Fourth Amendment provides, in part:

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated * * *."

Under the Fourth Amendment, consent of a third party may be valid if it is based on apparent authority. *Illinois v. Rodriguez*, 497 US 177, 188-89, 110 S Ct 2793, 111 L Ed 2d 148 (1990). However, under Article I, section 9, third-party consent is valid only if the consenting party has actual authority to consent. *State v. Ready*, 148 Or App 149, 152-53, 939 P2d 117, *rev den*, 326 Or 68 (1997).

[4] It is undisputed that the wooden box was, in fact, defendant's personal property.

omitted). An officer's good faith belief that a third party has authority to consent is immaterial to that determination. *State v. Carsey*, 295 Or 32, 45-46, 664 P2d 1085 (1983).

A third party has "actual authority" to consent to a search only if he or she has "common authority as shown by that person's joint use or occupancy of the premises before validly authorizing the search." *Fuller*, 158 Or App at 505 (internal quotation marks omitted). The assumption underlying that principle is that joint use or occupancy of premises creates a risk that a co-occupant might consent to a search of the premises. *Carsey*, 295 Or at 44-45.[5] Accordingly, the "scope of a person's authority [to consent] depends on the level of access that the co-occupants have agreed on." *State v. Kurokawa-Lasciak*, 249 Or App 435, 440, 278 P3d 38, *rev den*, 352 Or 378 (2012). Specifically, "when there is no evident agreement to the contrary, one co-occupant is presumed to have completely assumed all risk that the other will consent to a search; the other has a full quantum of authority." *Id.*

Significantly—and, here, ultimately dispositively—the presumption of authority to consent to a search of jointly occupied *space* does not categorically apply with respect to searches of *items* within that space: "[A]uthority to consent to a search of an area is not necessarily coextensive with authority to consent to a search of personal items within that area." *Fuller*, 158 Or App at 506. Rather, with respect to items of personal property within jointly occupied space, a co-occupant's actual authority to consent to a search depends on that person's use of, or access to, those items. *Id.* In that regard, we "look at whether the effects are communally used by the parties or exclusively used by one party[.]" *Id.* (citations omitted).

Returning to the particulars of this case, as noted, defendant first argues that Dabbs lacked actual authority to consent to the officers' entry into the storage area of the converted garage—which, in turn, gave the officers access

[5] Although *Carsey* addressed a Fourth Amendment-based challenge, we have subsequently applied its reasoning with respect to motions predicated on Article I, section 9. *State v. Kurokawa-Lasciak*, 249 Or App 435, 440, 278 P3d 38, *rev den*, 352 Or 378 (2012) (describing history).

to the door of the apartment. However, we need not resolve that question if we ultimately agree with defendant that, in all events, Bull lacked actual authority to consent to a search of the wooden box that contained the methamphetamine. Accordingly, we start—and end—with that matter.

Both parties agree that Bull had common authority over the shared bedroom and, therefore, could consent to a search of the *bedroom space*. However, as noted, "authority to consent to a search of an area is not necessarily coextensive with authority to consent to a search of *personal items* within that area." *Fuller*, 158 Or App at 506 (emphasis added). Again, as noted, the determination of whether a roommate can authorize the search of effects within a particular area "depends on the extent of the roommate's use of, access to, and control of the premises, or effects therein," which includes, in part, "whether the effects are communally used by the parties, or exclusively used by one party[.]" *Id.* (internal quotation marks and citations omitted).

*Fuller* is illustrative. There, the defendant and his girlfriend, Stites, shared a bedroom. *Id.* at 503. Stites, in the defendant's absence, consented to a search of their shared bedroom and, ultimately, told an officer that there was methamphetamine in the defendant's nightstand. *Id.* at 503-04. Specifically, Stites told the officer that the defendant "had given her methamphetamine out of his nightstand before and that she had taken the drug from the nightstand on her own when it was unlocked." *Id.* at 504. However, she stated that, "if [the] defendant's nightstand was locked, she did not have a key and could not open it." *Id.* According to the officer, the nightstand was unlocked and partially open and, inside, he found methamphetamine and related paraphernalia. *Id.*

The defendant, who was subsequently convicted of delivery and possession of a controlled substance, appealed, assigning error to the denial of his motion to suppress. *Id.* We held that the trial court had erred in concluding that Stites had actual authority to consent to the search of the defendant's nightstand. *Id.*

In so holding, we reiterated the principles set out above and then, consistently with the standard of review,

canvassed the evidence pertaining to Stites's purported actual authority to consent to a search of property that was identified as the defendant's:

> "Stites had taken drugs out of defendant's nightstand before and * * * defendant often locked the drawer of his nightstand to which Stites did not have a key. As an initial matter, the fact that the drawer was unlocked does not, in and of itself, allow an inference that Stites was permitted to open the drawer; neither does taking into account her conduct with respect to the drawer. Her *ability* to open and occasionally access the unlocked drawer, in the absence of any evidence of permission or acquiescence by defendant, does not, as a matter of law, support an inference that Stites was *actually authorized* to open or exercise control over the nightstand. * * * [T]here is no evidence that defendant knew that Stites was getting into the nightstand, much less that he explicitly authorized or even implicitly acquiesced in that conduct."

*Id.* at 506-07 (emphasis in original). In a footnote, we again emphasized that "the state bears the burden of proving *actual* authority" and that we could not infer from the facts that Stites had that authority. *Id.* at 507 n 2 (emphasis added). We thus concluded that the evidence "was insufficient to support an inference that Stites had actual authority to consent to a search of [the] defendant's nightstand." *Id.* at 507.

Thus, *Fuller* turned on the distinction between (1) the operative presumption, in the absence of evidence of limitation, of authority to consent to a search of jointly occupied space and (2) the requirement of proof, beyond the mere fact of joint occupancy, establishing one occupant's actual authority to consent to the search of items that are the property of another joint occupant. That additional, requisite proof may include evidence of unfettered access and "communal[] use[]" or express authorization, *id.* at 506, but mere joint occupancy of the premises is not enough. Here, the state failed to meet its burden of proving Bull's actual authority *vis-à-vis* the wooden box.

There is no evidence in the record that Bull herself ever used the wooden box, much less that defendant consented to, or knowingly acquiesced in, any such access and

use. Although the state posits that defendant's testimony that "lots of people" had access to the bedroom supports an inference that Bull (among others) had unrestricted access to the wooden box, that testimony is legally insufficient to bear such an inference. Again: Access to joint space and access to personal items within that space are qualitatively distinct. The former does not determine the latter.

The state, in arguing to the contrary, invokes *Kurokawa-Lasciak* and, specifically, our observation there that, "when there is no evident agreement to the contrary, one co-occupant is presumed to have completely assumed all risk that the other will consent to a search; the other has a full quantum of authority." 249 Or App at 440. From that statement, the state propounds that, absent evidence of an agreement limiting access, a co-occupant is presumed to have full authority not only over the jointly occupied space but also over any personal property within that space. The state reasons that, because there was no evidence of a limiting agreement in this case, the presumption is that defendant assumed the risk that Bull would "consent to a search of the room and its contents" including the wooden box.

Our statement in *Kurokawa-Lasciak* does not bear the connotation that the state would ascribe. That is so for at least three related reasons. *First, Kurokawa-Lasciak* itself did not involve actual authority to consent to a search of another person's property located within jointly occupied space. Rather, the issue there involved one person's purported authority to consent to a search of shared space—*viz.*, a van. 249 Or App at 442.[6]

---

[6] In *Kurokawa-Lasciak*, the issue was whether the defendant's girlfriend, Campbell, had common access to and control of the defendant's van when she gave the officer consent to search it. 249 Or App at 442. We determined that the evidence in that case established that, although the defendant had given Campbell the key to his van, he had expressly limited her authority to access the van when he instructed her to only "check on the dog, lock [the van] up, and don't go anywhere, just wait for me." *Id.* (internal quotation marks omitted). Furthermore, until the officer persuaded her to the contrary, Campbell did not believe that she had authority over the van beyond what the defendant had instructed her to do. *Id.* at 444. Accordingly, we concluded that Campbell did not have actual authority to consent to a search of the van. *Id.*

*Second,* among the precedents that we cited in *Kurokawa-Lasciak* was *Fuller. See id.* at 440. While *Fuller*'s discussion of the roommate's (Stites) authority to consent to a search of jointly occupied space was apposite to the dispute in *Kurokawa-Lasciak,* nowhere in *Kurokawa-Lasciak* did we purport to repudiate *Fuller*'s holding with respect to actual authority to consent to the search of another joint occupant's personal property.

*Third, Kurokawa-Lasciak* did not refer to, much less purport to overrule, our precedents on which *Fuller* relied. *See, e.g., State v. Edgell,* 153 Or App 108, 956 P2d 988 (1998) (concluding that the driver of a car did not have actual authority to consent to a search of the passenger's personal items); *State v. Lynch,* 94 Or App 168, 172, 764 P2d 957 (1988) ("The owner of a vehicle * * * may consent to a search of that vehicle by police, but may not consent to a search of a passenger's effects unless those effects are in common use by the occupants of the vehicle or are jointly controlled by the passenger and the owner of the vehicle."); *see also State v. Doyle,* 186 Or App 504, 510, 63 P3d 1253, *rev den,* 335 Or 655 (2003) ("[T]he holding in *Edgell* followed from our unwillingness to endorse the extension of a third party's actual authority to consent to a search of broader premises to include authority to consent to a search of a defendant's separately owned property situated within the confines of those premises.").

In sum, Bull lacked actual authority to consent to a search of defendant's wooden box. Accordingly, the trial court erred in denying defendant's motion to suppress the baggies of methamphetamine unlawfully discovered in the box.

In so holding, we fully appreciate that Scriven acted in good faith in searching the box. Consistently with the trial court's findings, at the time that Scriven obtained consent to search the bedroom, "there wasn't any prior indication that anyone else lived in that room besides * * * Bull," and the box was not readily identifiable as belonging to anyone other than Bull. Nevertheless, for purposes of Article I, section 9, Scriven's belief that Bull had actual authority to consent to a search of the bedroom and its contents is irrelevant. *See,*

*e.g.*, *Carsey*, 295 Or at 45-46 ("The good faith of the searching officers * * * is irrelevant.").[7]

Our conclusion with respect to the search of the wooden box also compels suppression of defendant's inculpatory statements when confronted with the unlawfully discovered methamphetamine, as well as the other inculpatory evidence (including the "snort tubes") discovered following her concurrently obtained consent to search. Whatever the ultimate implications and applications of *State v. Unger*, 356 Or 59, 333 P3d 1009 (2014), and *State v. Lorenzo*, 356 Or 134, 335 P3d 821 (2014), it is patent that defendant's inculpatory admissions and concurrently elicited consent were the unattenuated products of the unlawful search and discovery of the methamphetamine.

Reversed and remanded.

---

[7] The outcome under the Fourth Amendment might well be different. *See, e.g., United States v. Snype*, 441 F3d 119, 136 (2d Cir), *cert den*, 549 US 923 (2006) ("[O]pen-ended consent would permit the search and seizure of any items found in the apartment with the exception of those 'obviously' belonging to another person."); *United States v. Melgar*, 227 F3d 1038, 1041-42 (7th Cir 2000) (where a woman who had rented a hotel room gave unqualified consent to search, that consent lawfully encompassed search of a nondescript purse where the police "had no reason to know that the floral purse * * * did not belong to" the person giving consent). *Accord United States v. Davis*, 332 F3d 1163, 1169 (9th Cir 2003) ("A third party has actual authority to consent to a search of a container if the owner of the container has expressly authorized the third party to give consent or if the third party has mutual use of the container and joint access to or control over the container." (Internal quotation marks omitted.)).