TOOKEY, J.
*365 In this juvenile delinquency case, youth appeals a judgment finding him within the jurisdiction of the juvenile court for acts that, if committed by an adult, would constitute two counts of attempted assault in the first degree, ORS 161.405 ; ORS 163.185, and one count of attempted unlawful use of a weapon, ORS 161.405 ; ORS 166.220. In his first assignment of error, youth challenges the trial court's denial of his motion to suppress his journal and its contents, which included plans to engage in a mass shooting at his high school. Specifically, youth argues that his mother, who consented to police officers conducting a warrantless search of youth's room, did not consent to a search of "closed containers within [youth's] room"-viz. , the journal itself and a guitar case within which the journal was found. Additionally, youth asserts that, even if his mother did consent to the search, she lacked "actual authority" to do so. For the reasons that follow, we affirm.[1]
I. FACTS AND PROCEDURAL HISTORY
"When reviewing a denial of a motion to suppress evidence obtained through the state's search and seizure, we are bound by the trial court's findings of historical fact 'if there is constitutionally sufficient evidence in the record to support those findings.' "
*299 State v. Voyles , 280 Or. App. 579, 581, 382 P.3d 583, rev. den. , 360 Or. 751, 388 P.3d 718 (2016) (quoting State v. Ehly , 317 Or. 66, 75, 854 P.2d 421 (1993) ). "If findings are not made on all pertinent historical facts, 'we will presume that the trial court found facts in a manner consistent with its ultimate conclusion.' " Id. (quoting State v. Stevens , 311 Or. 119, 127, 806 P.2d 92 (1991) ).
"Applying the above factual standard of review, we state the relevant facts from the trial court's findings and the record." Id. When police officers conducted the search at issue in this case, youth was 17 years old and living with his mother. Youth had his own bedroom in his mother's house, but he did not have "exclusive control over [his] bedroom and its contents." To the contrary, youth's mother "consider[ed]
*366 that she has control over the entire house and all [that's] in it, including [in youth's] bedroom" and had access to "[youth's] things in his room." Youth's mother "ultimately * * * set the rules" at the house "because it is [her] home," and youth understood that his mother was "in charge of the house and he follow[ed] her direction[s] or rules."
Youth's mother went into youth's bedroom "at will * * * on an almost daily basis," to, among other things, "go and get dirty dishes, clean, [pick up] dirty clothes[,] that kind of thing." Youth never protested his mother's entries into his room, asked her to leave or not to look at or in anything in the room, or "expressed any other expectation of privacy from his mother." The door to youth's bedroom had no locks or other barriers. There were "no private areas in the house."
Additionally, as a result of youth's probations in separate juvenile cases, youth's mother was "contractually bound to supervise [youth] in their home and elsewhere and required to report any variance from his probation conditions to [his] juvenile probation officer." Youth's mother was "actively involved in his supervision." Youth's probations also required youth "to follow his mother's reasonable directions at home."
With respect to the guitar case and journal that were searched in this case, youth's mother was aware that youth had a guitar in a canvas guitar case that had been given to youth by his pastor. Youth had never told his mother that she could not open his guitar case, but also had never given her permission to allow a search of the guitar case. Youth's mother testified that, "if" youth had a journal or a diary, youth had not given her permission to read it, nor had he given her "permission to allow other persons to go into his room and search his things and go through his room just generally."
The search at issue in this case occurred on or about March 3, 2016. Police officers went to youth's home to take youth into custody on probation violation detainers and also to question youth regarding allegations that he was planning a mass shooting at his school. After police officers were let into the home by a male friend of youth's mother, an officer *367 asked youth's mother if youth was home. Youth's mother told them "no." An officer then asked to look in youth's room to see if youth was there and youth's mother said, "That's fine." Officers looked in youth's room, and youth was not there.
An officer then told youth's mother "to some degree about the school shooting plan investigation" that the officers were conducting and "asked for consent to search [youth's] room." The trial court found that youth's mother said "something like, 'Knock yourself out,' 'Go for it,' or words to that effect." At no time did she "express any limitations regarding [youth's] room, its contents or any other limitation on her authority to consent to search" or "protest[ ] the officers searching [youth's] room or seizing items before, during or after the search."
After youth's mother consented to the search, officers entered youth's room "looking for firearms, equipment that might be used to chain fences, bombs or bomb making materials and [a] black notebook or journal" that they had been informed contained plans for a school shooting. One of the officers found a black journal in an outside pocket of the canvas guitar case. The journal was held shut by an elastic band. The officer then opened the journal and saw "plans to kill at least 100 people and set off bombs" at youth's school.
*300 The trial court's findings of fact reflect that at some point-although "[t]here is some dispute as to when"-youth's mother was told that police officers "specifically wanted to look for a journal or notebook." As noted above, before giving consent to search, youth's mother was informed "to some degree about the school shooting plan investigation." Additionally, during the search itself, one of the officers told youth's mother that the officers searching youth's room "were looking for a notebook or journal that had a black leather cover." Youth's mother was unaware of such a journal, but, during the search, retrieved a "school notebook/binder" belonging to youth and gave it to the officer. After reviewing its contents, the officer informed youth's mother that the "school notebook/binder" was not what they were looking for. The trial court determined that, even if the officer requesting consent to search youth's room did not specifically tell youth's mother "that the search was especially for *368 the journal * * * it could be inferred that she knew that was what was being sought."
Subsequently, youth arrived home and was taken into custody on the probation violation matter.
Youth was charged with two counts of conduct that, if committed by an adult, would constitute attempted first-degree assault, ORS 161.405 ; ORS 163.185, and one count of conduct that, if committed by an adult, would constitute attempted unlawful use of a weapon, ORS 161.405 ; ORS 166.220. At trial, youth moved to suppress the journal and its contents, arguing both that the search exceeded the scope of his mother's consent and that his mother lacked actual authority to permit police officers to search his personal property.
In a written opinion denying youth's motion to suppress, the trial court determined that youth's mother consented to a search of youth's room "generally for evidence that might be relevant to a planned school shooting." It also determined, as noted above, that, while the officer who requested consent to search youth's room "may not have told [youth's mother] the search was especially for the journal, it could be inferred that she knew that was what was being sought."
Additionally, the trial court concluded that youth's mother had "actual authority to consent to a search of [youth's] bedroom," reasoning, in part, that
"[s]he was an involved parent who had house rules and access to all areas of the house. There were no private areas. There was not a padlock on [youth's] bedroom door or any other barrier, a 'do not enter' sign or other expression by [youth] that could be seen to limit [youth's] mother's access to [youth's] bedroom. [Youth] had never told or asked his mother not to go in his room, not to look in his guitar case, journal or other 'container.' Importantly, [youth] was a minor, subject to parental authority, guidance and discipline, including control over his living environment including his bedroom. Further, [youth] was on probation and his mother, as a parent and a party to the proceeding, was obligated-and [youth] knew this-to maintain close supervision over [youth], his companions and his surroundings as a part of that probation."
*369 As noted above, on appeal, youth argues that the trial court erred by denying his motion to suppress. Specifically, youth first argues that his mother's consent to search did not extend to closed containers within youth's room-viz. , the guitar case and journal. Youth next argues that his mother lacked actual authority to give that consent.
II. ANALYSIS
Article I, section 9, of the Oregon Constitution provides, in pertinent part, "No law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure[.]" As a general matter, "[j]uveniles are entitled to the protections guaranteed by Article I, section 9," including its protection against unreasonable search.[2]
*301 State ex rel. Juv. Dept. v. S. L. M. , 227 Or. App. 408, 411, 206 P.3d 283 (2009). The Oregon Supreme Court "has adopted a categorical view under Article I, section 9, that, subject to certain specifically established and limited exceptions, deems warrantless searches to be per se unreasonable." State v. Bonilla , 358 Or. 475, 480, 366 P.3d 331 (2015).
A. Consent
One exception to the warrant requirement is consent. Bonilla , 358 Or. at 480, 366 P.3d 331. "When the state relies on consent" to establish that a search was lawful, "it must prove by a preponderance of the evidence that someone having the authority to do so voluntarily gave the police consent to search the defendant's property and that any limitations on the scope of the consent were complied with." Id. at 481, 366 P.3d 331 (internal quotation marks omitted).
Recently, the Oregon Supreme Court clarified that the scope-of-consent inquiry is a factual one. State v. Blair , 361 Or. 527, 537, 396 P.3d 908 (2017). In particular, in determining "whether a particular search falls within the scope" of a person's consent, "the trial court will determine, based *370 on the totality of circumstances," what the person giving the consent "actually intended." Id. ; see also State v. Winn , 361 Or. 636, 642, 396 P.3d 926 (2017) (same). That factual determination "must be upheld on appeal or review if supported by evidence in the record." Id. Additionally, in Blair , the court noted that, "where-based on the totality of circumstances-the defendant's intent with respect to the scope of her consent is unambiguously expressed, that manifestation of intent is controlling." 361 Or. at 538, 396 P.3d 908.
In this case, we conclude that the trial court's determination that youth's mother gave officers consent to search youth's room "for evidence that might be relevant to a planned school shooting," including a search for and of youth's journal, is supported by evidence in the record. That evidence in the record includes that of youth's mother (1) consenting to a search of youth's room without expressing any limitation on the search after she was told "to some degree about the school shooting plan investigation," (2) actively assisting officers in their search for the notebook or journal by providing a notebook belonging to the youth to an officer after she was explicitly informed that officers were searching for a "notebook or journal," and (3) failing to object or express any limitation on the officers' search of youth's room after she was unambiguously made aware that officers were searching for a notebook or journal in the youth's room.[3]
*371 B. Actual Authority
As noted above, on appeal, youth also contends that, even if the scope of his mother's consent extended to closed containers in his room, she "lacked actual authority to consent to a search of the guitar case and journal."
" 'Whether [a] third party had actual authority [to consent to a search] involves a resolution of factual issues, but the question of whether a person ha[d] actual authority at the time consent is given is ultimately a question of law.' " State v. Bonilla , 267 Or. App. 337, 341, 341 P.3d 751 (2014), *302 aff'd , 358 Or. 475, 366 P.3d 331 (2015) (quoting State v. Surface/Hurley , 183 Or. App. 368, 372-73, 51 P.3d 713 (2002) (third brackets in Bonilla ) ). "Where, as in this case, the police rely on consent from someone other than the defendant, it is necessary to establish the basis of the third party's authority." Bonilla , 358 Or. at 481, 366 P.3d 331. "As an example of valid authority, a co-inhabitant with common authority over property, based on joint access or control, generally has authority to give consent to search the property." Id.
The Oregon Supreme Court's decision in State v. Carsey , 295 Or. 32, 664 P.2d 1085 (1983), is instructive in analyzing youth's argument. See Bonilla , 358 Or. at 481, 366 P.3d 331 (relying on Carsey ).[4] In that case, the court considered a defendant's argument that evidence discovered in his bedroom at his grandparents' house during a warrantless search consented to by his grandmother should have been suppressed because his grandmother lacked authority to consent to such a search.[5] Carsey , 295 Or. at 35-38, 664 P.2d 1085. At the time of the search, although the defendant was 19 years old, the court assumed, for the purposes of its opinion, that, because the *372 defendant was living with his grandparents while he was on parole pursuant to a release agreement for conduct in which he had engaged as a juvenile, the grandmother "had legal custody of the defendant and had the same relationship to the defendant as a parent to a minor child living at home." Id. at 35-36, 664 P.2d 1085.
The living arrangement between the defendant in Carsey and his grandparents was described by the trial court in that case as follows:
"The Defendant occupied a bedroom in his grandparents' home for which he paid $60 per month as rent. He did his own cleaning and washing. His grandfather never went into his room. His grandmother never went into his room except to stick her head in and tell him that a meal was ready. She characterized the arrangement as an unspoken agreement that his room was under his exclusive control."
Id. at 36, 664 P.2d 1085. The trial court "found that the defendant had exclusive control over his room and held that the grandmother's consent was unauthorized because defendant had exclusive control over his bedroom and had a reasonable subjective expectation of privacy."[6] Id. at 34, 664 P.2d 1085 (internal quotation marks omitted).
In analyzing whether the defendant's grandmother in Carsey had actual authority to consent to a search of the defendant's room, the Supreme Court first recognized that
"[c]ases involving consent obtained from parents or other relatives pose unique problems stemming from the fact that families ordinarily have common use of many household areas; that it is normal for the owner of a home to exercise control over all areas of the home, or if control is not actually exercised or is seldom exercised, that the right to exercise control over all areas exists; and that parents, by reason of the parent-child relationship, have a measure of control over all aspects of their *303 childrens' lives, activities, effects, and living quarters."
*373 Id. at 42, 664 P.2d 1085. The court then explained that, while it was "not prepared to hold * * * that the relation of parent and child, as a matter of law, in and of itself and in every case, necessarily creates the foundation for a valid consent search[,] [i]n many, perhaps most, cases the facts would support such a finding." Id. It went on to note that "the parent-child relationship is an important factor to be considered in determining the validity of the consent in a case in which the consent is obtained from a parent," but other factors too must be considered, "an important one being the consenting parent's control over the premises for the search of which consent was given." Id. at 43, 664 P.2d 1085.
Ultimately, in Carsey , the court concluded that the trial court did not err in determining that the grandmother lacked actual authority to consent to the search because there were facts in the record that "support[ed] the trial court's finding that the defendant 'had exclusive control over his room' " and it was "bound by those factual determinations." Id. It also noted that it was not "suggest[ing] that had the trial court upheld the search on the basis of a valid consent [the court] would overturn that ruling." Id.
Similarly, in S. L. M. , 227 Or. App. at 410, 206 P.3d 283, we considered whether the trial court had erred by failing to suppress evidence that was discovered when the defendant's mother searched the defendant's purse at the suggestion of a police officer. The defendant in S. L. M. was 16 years old at the time of the search. Id. In analyzing the motion to suppress, we recognized that, under Carsey , "[t]he extent of a parent's authority [to authorize a search of a youth's property] depend[s] on the facts of each case-for example, the nature of the relationship between the parent and the child and, in particular, the record of the nature of their use and control of the property that was involved in the search." Id. at 411, 206 P.3d 283. We ultimately concluded that the trial court erred in failing to suppress the evidence, in part because there was "nothing in the record to establish whether youth's mother had a right to control the effects of her daughter." Id.
With that analytical framework in mind, we conclude that, in this case, the trial court did not err in determining that youth's mother had actual authority to consent *374 to the search of youth's guitar case and journal. As an initial matter, unlike the premises searched in Carsey , which were under "exclusive control" of the defendant, in this case, youth did not have exclusive control over his room or its contents. Rather, youth shared control over the contents of his bedroom with his mother, and youth's mother had unrestricted access to the items in youth's room.
Further, the nature of the parent-child relationship in this case, unlike the parental relationship in Carsey , supports the trial court's conclusion that youth's mother had actual authority to consent to the search of youth's guitar case and journal. Youth's mother was an "involved parent," there were "no private areas" in their household, youth was a minor "subject to parental authority, guidance and discipline," youth "had never told or asked his mother not to go in his room, not to look in his guitar case, journal or other 'container,' " and youth's mother entered his room almost daily. In fact, youth never "expressed any * * * expectation of privacy from his mother." Additionally, youth's mother, as a parent and a party to the prior adjudication that resulted in youth being on probation, "was obligated to maintain close supervision over [youth] * * * and his surroundings." Finally, unlike in Carsey , where the defendant "did his own cleaning and washing" and paid rent, in this case, youth's mother cleaned up after youth and there is no evidence of youth paying rent. Thus, based on the particular parent-child relationship in this case, as well as youth's mother's access to and control over youth's room and the effects therein, youth's mother had actual authority to consent to the search of his room, his guitar case, and his journal.
Youth argues that his mother did not have actual authority to consent to the search of the guitar case and journal because (1) the guitar case "belonged to the youth and was a gift to the youth only," (2) the "scope" of "youth's mothers access to youth's room was *304 for things like retrieving dishes and dirty laundry," and (3) youth was "17 years old-nearly an adult, and certainly not so young that he might not expect at least the journal to be for mother's viewing rather than [a] private space[ ] for a teenager to explore thoughts he might wish to keep from his mother." *375 For two reasons youth's arguments do not convince us that the trial court erred. First, in light of the particular relationship between youth and his mother as described above, youth's contentions do not alter our conclusion that youth's mother shared control with youth over youth's room and the effects therein. Second, with respect to access, while youth's mother testified that one of the reasons she would enter youth's room was to "go and get dirty dishes, clean, [and pick up] dirty clothes," she did not testify that her access was limited to only cleaning up for youth. To the contrary, her testimony was clear that she had access to "[youth's] things in his room," and the trial court found-without limitation-that she had "access to all areas of the house." We are bound by that finding. Voyles , 280 Or. App. at 581, 382 P.3d 583.
In arguing that the trial court erred, youth also relies on Bonilla , 267 Or. App. at 337, 341 P.3d 751, and State v. Fuller , 158 Or. App. 501, 976 P.2d 1137 (1999), emphasizing that, in those cases, when determining whether one co-inhabitant had authority to consent to a search of items that were the property of another co-inhabitant, we looked to "whether the items [were] communally used by the parties or exclusively used by one party." (Internal quotation marks omitted.) Youth correctly points out that the record in this case does not reflect joint use of the guitar case or journal.
We believe that our opinions in Bonilla and Fuller are of limited use in analyzing the question before us because neither case analyzed whether a parent could consent to a search of property purportedly belonging to the parent's minor child. See Bonilla , 267 Or. App. at 338-40, 341 P.3d 751 (88-year-old mother of the adult defendant did not have actual authority to consent to a search of a wooden box belonging to the defendant in a bedroom that they shared); Fuller , 158 Or. App. at 506-07, 976 P.2d 1137 (co-inhabitant of shared bedroom did not have actual authority to consent to a search of a nightstand belonging to the adult co-inhabitant). Accordingly, neither case expressly considered the import of the parent-child relationship in determining whether the party consenting to the search had actual authority to do so. As discussed, this case presents the type of parent-child relationship that *376 the Supreme Court indicated will create "the foundation for a valid consent search[,] [i]n many, perhaps most, cases." Carsey , 295 Or. at 42, 664 P.2d 1085.
III. CONCLUSION
In sum, we conclude that the trial court's determination that youth's mother gave officers consent to search youth's room "for evidence that might be relevant to a planned school shooting," including a search for and of youth's journal, is supported by evidence in the record. Additionally, youth's mother's access and control, coupled with the particular parent-child relationship in this case, leads us to conclude that the trial court did not err in concluding that youth's mother had actual authority to consent to the search of items in youth's room, including youth's guitar case and journal. Consequently, we affirm.
Affirmed.

On appeal, youth raises five assignments of error. We reject assignments of error two through five without written discussion.

In addition to Article I, section 9, of the Oregon Constitution, youth points to the Fourth Amendment to the United States Constitution in his briefing. Youth notes, and the state does not disagree, that "youth's state-law claim is dispositive on the federal-law claim as well."

In their briefing, the parties disputed the applicable test to determine the scope of a person's consent to search. At oral argument, youth acknowledged that Blair and Winn were controlling and that the scope of consent is a "factual inquiry." Youth argued, however, that, under Blair and Winn , where the record "supports competing inferences about what the consenting person intended the scope to be, then remand is necessary for the trial court to resolve that factual dispute." In this case, according to youth, remand is necessary because, from the record, "you could infer" either "that [youth's mother] intended for only the room to be searched" or that youth's mother "intended at least a notebook to be searched." The state responded that, in this case, it did not believe "there could be competing inferences" because "you have [youth's] mother being told [that police] are searching for the notebook and then trying to help [police] find the notebook." The state also contended that that conduct by youth's mother was an "unambiguous manifestation of consent" with respect to the search and that, under Blair and Winn , that manifestation of intent "would control the factual inquiry." In this case, unlike in Blair , the trial court analyzed scope of consent as a factual inquiry and resolved that inquiry. Because evidence exists in the record to support the trial court's factual determination, we are bound by it. Winn , 361 Or. at 642, 396 P.3d 926. Accordingly, remand is not necessary.

Though Carsey was decided under the Fourth Amendment to the United States Constitution, we-and the Supreme Court-have subsequently applied its reasoning when analyzing motions to suppress predicated on Article I, section 9. Bonilla , 358 Or. at 481, 366 P.3d 331 ; Bonilla , 267 Or. App. at 342 n 5, 341 P.3d 751 ("Although Carsey addressed a Fourth Amendment-based challenge, we have subsequently applied its reasoning with respect to motions predicated on Article I, section 9.").

The Supreme Court framed the questions before it as "(1) whether a police search of a child's room, made pursuant to the consent of a parent, is, as a matter of law, permissible, and (2) where police conduct an otherwise illegal search of the defendant's room pursuant to consent obtained from a third person, is the search legal if the searching officers reasonably believed that the third person had sufficient authority over the premises to consent to the search?" Carsey , 295 Or. at 34, 664 P.2d 1085.

Notwithstanding its conclusion that the search was "unauthorized," the trial court in Carsey ultimately denied defendant's motion to suppress because the police had a "good faith objective and reasonable belief that the grandmother had authority to consent." 295 Or. at 34, 664 P.2d 1085 (internal quotation marks omitted). The Supreme Court concluded that "the subjective good faith of the police" did not render the search constitutional. Id. at 45-46, 664 P.2d 1085.