Submitted on remand from the Oregon Supreme Court November 1, 2011, affirmed April 25, petition for review denied September 13, 2012 (352 Or 378)

STATE OF OREGON,
*Plaintiff-Appellant,*

*v.*

TYLER JURO KUROKAWA-LASCIAK,
*Defendant-Respondent.*

Douglas County Circuit Court
07CR1309FE; A140430

278 P3d 38

John R. Kroger, Attorney General, Erika L. Hadlock, Acting Solicitor General, and Jeremy C. Rice, Assistant Attorney General, for appellant.

Jay W. Frank and Moule & Frank for respondent.

Before Ortega, Presiding Judge, and Schuman, Judge, and Sercombe, Judge.

SCHUMAN, J.

**SCHUMAN, J.**

This case is before us on remand from the Supreme Court. *State v. Kurokawa-Lasciak*, 351 Or 179, 263 P3d 336 (2011) (*Kurokawa-Lasciak II*). In our original opinion, *State v. Kurokawa-Lasciak*, 237 Or App 492, 498, 239 P3d 1046 (2010) (*Kurokawa-Lasciak I*), we held that a law enforcement officer's warrantless search of defendant's van, leading to the discovery of various controlled substances, did not violate Article I, section 9, of the Oregon Constitution, because the search fell within one of the exceptions to the warrant requirement—the so-called "automobile exception." Because we held that the search was valid under that exception, we did not reach the state's alternative argument that the search was also valid because defendant's companion consented to it. The Supreme Court reversed, holding that the search did *not* fall within the automobile exception, and remanded the case for us to consider the state's argument that the police had valid consent. *Kurokawa-Lasciak II*, 351 Or at 193. We now conclude that defendant's companion lacked authority to consent to a search of the vehicle and, for that reason, the search was unlawful. We therefore affirm the trial court's suppression of evidence that the search disclosed.

The following facts are consistent with the trial court's findings and its decision to grant defendant's motion to suppress. *State v. Meharry*, 342 Or 173, 175, 149 P3d 1155 (2006) (stating standard). Defendant, his companion Campbell, and their three children were at the Seven Feathers Casino, where defendant was gambling. A casino employee monitoring defendant's conduct noticed that he would buy chips with small-denomination bills, play casino games, and then cash in the chips for large-denomination bills. The employee suspected that defendant was engaged in money laundering. As a result, the casino barred defendant from further cash transactions and posted his photograph in the cashiers' cages. When a cashier later refused to carry out a cash transaction for defendant, he reached through the cage, grabbed his photo, and left the casino. A casino employee telephoned a state trooper, Bennett, and reported that defendant had stolen casino property—the photograph.

Shortly thereafter, a different officer, Wohls, detained defendant for questioning in the casino parking lot as defendant was walking away from a van. Bennett, the trooper, arrived at the scene and also spoke to defendant. He asked defendant about the van and whether it contained drugs. When defendant did not respond, Bennett arrested him for disorderly conduct and third-degree theft; he also asked defendant for consent to search the van. Defendant refused. Bennett then told defendant that he could either consent to a search of the van or be taken to jail for disorderly conduct and theft. Defendant responded that he did not believe that Bennett's offer was sincere. Bennett then repeated his request to search the van, and also requested consent to search defendant's pockets and the room at the casino where defendant was staying. The Supreme Court related the remaining facts as follows:

> "Defendant said that he wanted to talk to a lawyer. Bennett told defendant that he was impounding the van and that he would get a search warrant. Wohls interjected that Bennett must inventory the vehicle.

> "At approximately 10:14 a.m., Wohls took defendant to the Douglas County Jail, leaving defendant's van parked at the casino. Neither Wohls nor Bennett impounded the van, inventoried its contents, or made efforts to obtain a search warrant.

> "Instead, Bennett continued his investigation and learned that defendant had given the van's keys to his girl-friend, Laura Campbell, and instructed her to lock the van, take care of the family dog, go to the casino's restaurant to eat, and stay put until he returned. At approximately 10:28 a.m., Bennett went into the restaurant to speak with Campbell. * * *

> "Bennett asked Campbell whether the van contained a large amount of money or drugs. Campbell replied that she did not know of any. Bennett then asked whether there was marijuana in the van; Campbell said that there was. Bennett asked whether the amount of marijuana was over or under an ounce; Campbell replied, 'It is probably under, but it could be over a little bit.'

> "Bennett asked Campbell if she would consent to a search of the van. Campbell hesitated and told Bennett that

she was not sure if she could consent because she was not listed on the rental agreement. Campbell told Bennett that she had the keys to the van and that it may be her intention to leave. However, Campbell agreed to meet Bennett outside the restaurant, by the van, when she and her children finished their breakfast.

"At approximately 11:00 a.m., Campbell met Bennett at the van and recorded his conversation with her. Bennett asked for Campbell's consent to search, and Campbell told Bennett that she was feeling 'badgered.' Bennett denied that he was badgering Campbell and continued to talk with her. Bennett allowed Campbell to take the dog out of the van and make a telephone call. At approximately 11:15 a.m., Campbell signed a 'consent to search' form. Bennett searched the van and found the evidence that was the subject of the later motion to suppress: 77 grams of marijuana, 56 grams of hashish, electronic scales, and approximately $48,000 in cash."

*Kurokawa-Lasciak II*, 351 Or at 183-84.

Based on those facts, defendant was charged with delivery of a controlled substance, ORS 475.840, possession of marijuana, ORS 475.864, money laundering, ORS 164.170, third-degree theft, ORS 164.043, and second-degree disorderly conduct, ORS 166.025. He moved to suppress the evidence discovered in the search, citing Article I, section 9, of the Oregon Constitution. The trial court granted the motion, reasoning that, under the United States Supreme Court's opinion in *Georgia v. Randolph*, 547 US 103, 126 S Ct 1515, 164 L Ed 2d 208 (2006), Campbell lacked authority to consent to the search of the van after defendant had previously refused permission. In *Randolph*, 547 US at 106, the Court held that "a physically present co-occupant's stated refusal to permit entry prevails" over the voluntary consent of the other occupant. On the state's appeal, this court determined that the warrantless search was permitted by the automobile exception. *Kurokawa-Lasciak I*, 237 Or App at 499. We therefore did not reach the state's contention that the search was permitted based on Campbell's consent.

The Supreme Court disagreed with our conclusion that the search was permitted under the automobile exception, explaining that the automobile exception did not apply

because the vehicle was not mobile at the time police first encountered it in connection with a crime. *Kurokawa-Lasciak II*, 351 Or at 194. The court remanded the case to us for consideration of the state's alternative argument that the warrantless search was authorized by Campbell's consent. We now address that issue.

The United States Supreme Court's decision in *Randolph*, and whether it extends to consent obtained over the refusal of a *nonpresent* co-occupant of a *vehicle* instead of a dwelling, is relevant in this case only if we decide that defendant's rights were not protected under Article I, section 9, of the Oregon Constitution. For that reason, we begin our analysis with the state constitutional question. *Sterling v. Cupp*, 290 Or 611, 614, 625 P2d 123 (1981) (when state's law protects person's rights, no federal question arises).[1] Because, as explained below, we conclude that the search in this case violated Article I, section 9, we affirm the trial court without reaching the federal question.

The general rule governing third-party consent has not changed significantly since 1983, when the Oregon Supreme Court in *State v. Carsey*, 295 Or 32, 44, 664 P2d 1085 (1983), adopted the rule from *United States v. Matlock*, 415 US 164, 94 S Ct 988, 39 L Ed 2d 242 (1974).

"The *Matlock* rule rests upon the premise that one who jointly occupies premises assumes the risk that the

---

[1] In *State v. Carsey*, 295 Or 32, 34 n 1, 664 P2d 1085 (1983), the Supreme Court decided a "third party consent" case under the Fourth Amendment, explaining:

"As we have often stated, we normally consider Oregon constitutional questions before any federal constitutional question because the state does not deny any right claimed under the federal constitution when the claim before the court is fully met by state law. We would do so in this case if the case had not been briefed and argued under the federal constitution and the defendant had claimed that his rights under the state constitution are different from and greater than his rights under the federal counterpart. Not having been raised, however, and because we agree with the Court of Appeals that the defendant's Fourth Amendment rights were violated, it is unnecessary for us to consider whether the defendant is entitled to greater protection under Article I, section 9, of the Constitution of Oregon."

(Citations omitted.) This court as well recently considered a third-party consent case under the Fourth Amendment. *State v. Caster*, 236 Or App 214, 234 P3d 1087 (2010). This case, however, was presented to the trial court as arising under Article I, section 9, of the Oregon Constitution, and we perceive no reason to deviate from our policy of examining state questions before federal ones.

co-occupant 'might permit the common area to be searched.' *Matlock*, 415 US at 171 n 7 * * *.

"* * * * *

"* * * Before police can search premises in reliance upon the consent of a third person, they should ascertain that the defendant and the consenting party have a common use, access, or control of the premises to be searched."

*Carsey*, 295 Or at 44-46. Although *Carsey* was decided under the Fourth Amendment, we subsequently adopted the same rule under Article I, section 9, holding that "common authority to validly consent to a search 'rests on mutual use of the property by persons generally having joint access or control for most purposes.' " *State v. Will*, 131 Or App 498, 504, 885 P2d 715 (1994) (quoting *Matlock*, 415 US at 171 n 7). The state has the burden of proving by a preponderance of the evidence that the consenting person has the requisite authority. *City of Portland v. Paulson*, 98 Or App 328, 330, 779 P2d 188 (1989). We defer to the trial court's express and implicit findings of fact, but whether those facts support a conclusion that the consenting person had authority is a legal question. *State v. Beylund*, 158 Or App 410, 417, 976 P2d 1141, *rev den*, 328 Or 594 (1999).

The rule from *Carsey* onward has derived principally from the idea that one joint occupant of premises has for most purposes assumed the risk that another occupant might permit a search of those premises. *Matlock*, 415 US at 171 n 7; *Carsey*, 295 Or at 44; *State v. Fuller*, 158 Or App 501, 506, 976 P2d 1137 (1999) ("Central to search and seizure law is whether an individual has, in some way, assumed the risk that a third party may legally consent to a search of that individual's property."); *Beylund*, 158 Or at 418 ("[D]efendant legally assumed the risk that [his tenant], the person he placed in charge of his property, would consent to a search."). Consequently, we have repeatedly held that the scope of a person's authority depends on the level of access that the co-occupants have agreed on. Thus, when there is no evident agreement to the contrary, one co-occupant is presumed to have completely assumed all risk that the other will consent to a search; the other has a full quantum of authority. For example, in *Beylund*, 158 Or App at 418, we held that the

defendant "legally assumed the risk" that his tenant would consent to a search because the tenant "had full access to the shop basement and entered it regularly to tend the marijuana plants. *There is no contrary evidence.*" (Emphasis added.) Likewise, in *State v. Surface/Hurley*, 183 Or App 368, 374-75, 51 P3d 713 (2002), we held that the defendants expressly gave house-sitters full control of "the household and everything pertaining to it," and, consequently, the house-sitters had "actual authority" over the defendants' freezer and "could lawfully consent to a search of it."

Conversely, we have also held that, where a defendant has expressly or by implication limited a co-occupant's authority, the resulting consent depends on whether the search is within that limited authority. In *Carsey*, 295 Or at 43, for example, the Supreme Court held that police could not rely on a grandmother's consent to search her grandson's room in the house that they shared because the evidence indicated that the defendant had not granted his grandmother control over the room. In *Fuller*, 158 Or App at 506, we held that, although the defendant and his girlfriend shared not only a house but a bedroom, and the girlfriend had authority to consent to a general search of the premises, the evidence indicated that she did not have authority to consent to a search of the defendant's nightstand. Even within a parent-child relationship, we have held, "the presence or absence of common authority hinges, necessarily, on the particular agreement between parent and child. Thus, whether defendant's parents had common authority to consent to the search of the garage here turns on their specific agreement with defendant regarding his use of the garage." *State v. Jenkins*, 179 Or App 92, 101, 39 P3d 868, *rev den*, 334 Or 632 (2002).[2]

---

[2] *State v. Lambert*, 134 Or App 148, 894 P2d 1189 (1995), is not to the contrary. In that case, a visitor in a house gave police authority to search the defendant's room. The defendant argued that the visitor lacked authority because she had no relationship with the landlord. We held that the visitor's authority did not derive from her relationship with the landlord; we did not address the question whether her authority derived from her relationship with the *defendant*. Had there been evidence that the defendant had expressly told the visitor to stay out of his room, we would likely have reached a different outcome.

Under these precepts, the consent issue in this case reduces to the question of whether defendant and Campbell had an understanding that Campbell had common access to and control of the van when she gave Bennett consent to search it. The trial court, relying on a federal case under the Fourth Amendment (*United States v. Morales*, 861 F2d 396 (3rd Cir 1988)), ruled that Campbell had authority to consent (although, as noted, the court also ruled that that consent was superseded by defendant's refusal). We do not find *Morales* helpful. The only issue in that case was whether a person who is the driver, but not the lessee, of a rental car, can consent to a search of the entire car, and the court based its decision on the fact that Morales, as the nonlessee driver, had immediate possession of and control over the car: "By giving Morales control over the car, [the actual lessee] conferred on Morales power to consent to a reasonable search of it." *Id.* at 399. No such delegation of control exists on the facts of this case.[3] The only evidence that Campbell had control of defendant's van was the fact that he had given her the key. However, as we have previously held, mere possession of the key to premises does not necessarily indicate complete access or control. *Fuller*, 158 Or App at 506 (consenting co-occupant had key, but nonetheless lacked authority to consent to search of nightstand).

The evidence in this case establishes that, although defendant gave Campbell the key to the van (and to that extent gave her control and access) the control and access were very narrowly limited—so much so that we conclude without difficulty that the access and control did not encompass consent to search. As Campbell and Bennett both testified, defendant gave Campbell the key after defendant had refused consent to search, after he was arrested, and when he knew that he was being taken away from the casino. Under those circumstances, he told Campbell to, "lock the van, take care of the family dog, go to the casino's restaurant to eat, and stay put until he returned." *Kurokawa-Lasciak II*, 351 Or at 183. Regarding those instructions, Campbell testified, "He gave me the keys, and he said, '[c]ome check on the dog, lock it up, and don't go anywhere, just wait for me.' "

---

[3] Further, of course, *Morales* is a federal case under the Fourth Amendment.

"Q: And you knew you were in a rental vehicle, right?

"A: Right.

"Q: And did you know whether or not you were authorized to exercise control over that car?

"A: Yeah. I knew I didn't have—I wasn't on the rental agreement. I mean—

"Q: Did you know you were not insured to drive the vehicle?

"A: Right. I knew I didn't have insurance.

"Q: And was there any doubt in your mind about what [defendant] meant when he said, 'Stay here. Lock it up. Wait for me to come back'?

"A: No.

"* * * * *

"Q: [Was there] ever a time when you kind of reached a decision and decided to go ahead and consent?

"A: There wasn't. There was not—I said no probably twice. Like in the restaurant, I said, 'No, I don't have the authority.' Like, 'No, I don't.' And then [Bennett] said, 'Well, you have the keys. You do have the authority.' We went out of the restaurant and I met him again. I was like, 'Well, I really don't think I can just because I don't have the authority. And again he assured me, 'Well, you do have the authority.' * * *

"* * * * *

"Q: The prosecutor suggested to you that you could come and go as you please, and that you had the keys to the van. What did [defendant] tell you? What were his specific directions to you when he handed you the keys?

"A. He said, 'Come back and check [on] the dog, and wait here. Don't go anywhere. I'll be back. Wait for me.'

"Q. Did he tell you to lock the car?

"A. Yeah, he said to lock it, keep it locked.

"Q. Did he tell you to stay there?

"A. Yeah. 'Don't go anywhere,' he said. 'Just wait here for me.'

"Q. And when he told you that, did you take that to mean lock the vehicle and leave it locked?

"A. Yeah. Yes, I did.

"Q. Was he at all hazy or ambiguous about that, or was it very, very clear?

"A. No. It was clear to keep it locked."

Until Bennett persuaded her to the contrary, Campbell clearly believed that she did not have authority beyond extracting the family dog, locking the van, and keeping it locked. We conclude that her belief was correct; defendant's instructions, in light of his circumstances, can only be construed as imposing strict limitations on Campbell's access to the van, and those limitations did not encompass consenting to a search. Put another way, if defendant had ever assumed the risk that Campbell might have consented to allow a police officer to search the van, he negated that assumption with his instructions to her.

We therefore conclude that, when Bennett obtained consent to search, that consent was not authorized. Because the search of the van was not lawful under the automobile exception or the consent exception and the state suggests no other justification, the evidence that was seized from the van was unlawfully obtained. The trial court did not err in granting defendant's motion to suppress.

Affirmed.