LINDER, S. J.
*724 In this juvenile delinquency case, the juvenile court found youth to be in the court's jurisdiction based on youth's unlawful possession of a firearm. ORS 166.250. On appeal, youth challenges the juvenile court's denial of his motion to suppress evidence of a gun that police found in youth's bedroom when they searched it based on consent given by youth's grandmother, who owned the home where youth was living. Youth argues that his grandmother could not authorize the search as against him because he was present at the time and objected to it. As we will explain, we conclude that the grandmother's consent was valid and, as a result, the search was lawful. We therefore affirm.
Although the parties disagree on the legal significance of the facts in the record, the facts themselves are not disputed. In all events, we state the facts and all reasonable inferences that the record supports in the light most favorable to the juvenile court's denial of the motion to suppress. State v. Beylund , 158 Or. App. 410, 416-17, 976 P.2d 1141, rev. den. , 328 Or. 594, 987 P.2d 515 (1999) (We defer to the trial court's express and implicit findings of fact, but whether those facts establish authority to consent to search is a legal question.).
At the time of the events involved in this case, youth was 16 years old and was living with his grandmother in a home that she owned. Youth, who had his own bedroom in the home, had lived there for two and one-half years. Youth helped with chores by "taking out the garbage, cleaning his own room," and otherwise doing "those kind of things." Youth paid no rent of any kind, however, and his grandmother required him to follow the rules that she set. Youth resisted the idea that his grandmother could go into his room at will, stating "emphatically" in conversations with her that it was his room. But his grandmother, just as emphatically, told him that "it's my house. If I want to go in there, I will go in there." And she did. The door was never locked. Youth's grandmother did not need his permission to enter his bedroom. She regularly went into youth's room to, among other things, wake him up for school, make sure windows were closed, and clean. Throughout the time that youth lived there, his grandmother's position was:
*725 "[I]f there's reasons for me to go in [youth's bedroom], I will go in. He's still in our home and still 16 and I will go in if I need to." Even so, she tried to "respect his space" by, for example, knocking on the door if it was shut before entering and not cleaning or picking up in the room right after waking youth if it disturbed him at that time. On those occasions, she would come back later, at which point she would clean and pick up things in the room as she chose.
The search in this case occurred after Officer Culp, a police officer who is also a high school resource officer, received a report that youth and one of his friends (Cameron, a 19-year-old former student) showed up with handguns the day before at an off-campus fight. Culp and two other officers went to *622 youth's home to investigate. The grandmother allowed the officers into the house. Then she walked directly back to youth's room and entered, permitting the officers to enter the bedroom with her. At the time, youth, Cameron, and a third friend (a 16 year old) were all asleep in youth's room.[1] Culp remained in the bedroom with youth, while the two other officers talked to his friends in other parts of the house. Culp asked youth for permission to search the room, but youth said he did not want the officer to search. Culp then said he would ask youth's grandmother for permission. Youth responded that if he told his grandmother not to allow the officer search, she would refuse. Before the officer could "get the words out" to ask the grandmother for her consent, she walked into the room and, having heard the officer ask for permission to search, said, "Go, look through whatever you want." The grandmother believed that she had the right to permit the search, explaining at the suppression hearing that "[i]t was my home and apparently there was something going on that shouldn't have been going on in my home and I wanted it resolved." Culp found a firearm in youth's room on an open shelf of an entertainment center, beneath a towel.
Youth was charged with committing acts that, if committed by an adult, would constitute unlawful possession *726 of a weapon under ORS 166.250. At trial, relying on both state and federal constitutional grounds, youth moved to suppress the evidence of the firearm seized in the search. In support of his motion, youth argued that his grandmother's consent to search was invalid as against him, because youth was physically present and expressly objected to the search. In response, the state argued that youth's grandmother, throughout the time that youth lived there, made it clear that it was "her house, her rules." As a result, the state contended, youth's grandmother retained full control over the premises, including youth's room and, therefore, had lawful authority to consent to the search despite youth's objection.
At the conclusion of the hearing on the motion to suppress, the juvenile court denied the motion, explaining:
"[T]he situation here is that the owner of the property, not even a landlord, basically a grandmother who was letting her grandson live in her home and who had asserted authority always over the room and being able to go in and out freely, really has a superior decision-making authority.
"I don't think it matters [that] the youth was there at the time that she gave consent. So I'm going to deny the motion to suppress."
After that ruling, the case proceeded to trial, and the juvenile court found youth to be in the jurisdiction of the court based on his unlawful possession of a firearm. This appeal followed. On appeal, although their positions are further developed and refined, the parties largely renew the arguments that they made to the juvenile court.[2]
The pertinent state and federal law principles are sufficiently parallel that we describe them in tandem. Under both Article I, section 9, of the Oregon Constitution and the *727 Fourth Amendment to the United States Constitution,[3] a warrantless search is *623 per se unlawful unless it falls into one of a few specifically established and limited exceptions to the warrant requirement. Katz v. United States , 389 U.S. 347, 357, 88 S. Ct. 507, 19 L.Ed. 2d 576 (1967) (so holding under Fourth Amendment); State v. Bonilla , 358 Or. 475, 480, 366 P.3d 331 (2015) (same under Article I, section 9 ). Consent is one of those well-recognized exceptions. Katz , 389 U.S. at 515 n. 22, 88 S.Ct. 507; Bonilla , 358 Or. at 480, 366 P.3d 331. Consent, however, is not limited to consent given by the person against whom evidence is offered (e.g. , a defendant in a criminal case or a youth in a delinquency proceeding). Rather, valid consent can be given by a third party if that person has control over access to or use of the premises or effects to be searched. United States v. Matlock , 415 U.S. 164, 170-71, 94 S. Ct. 988, 39 L.Ed. 2d 242 (1974) (so holding under Fourth Amendment); Bonilla , 358 Or. at 480-81, 366 P.3d 331 (same under Article I, section 9). Under the Fourth Amendment, the requisite authority can be actual or apparent. Matlock , 415 U.S. at 170-71, 94 S.Ct. 988 (actual authority); Illinois v. Rodriguez , 497 U.S. 177, 187-89, 110 S. Ct. 2793, 111 L.Ed. 2d 148 (1990) (apparent authority). Under Article I, section 9, only actual authority will suffice. Bonilla , 358 Or. at 486-87, 492, 366 P.3d 331.
Issues of the validity of third-party consent arise frequently in the context of individuals who live together in a common household. There, under the "common authority" doctrine, the general rule is that any of the joint users or co-occupants of the common premises has actual authority to consent to a search. That rule was first announced as a Fourth Amendment principle in Matlock , 415 U.S. at 170-71, 94 S.Ct. 988 *728 . See also State v. Carsey , 295 Or. 32, 44, 664 P.2d 1085 (1983) (discussing and applying Matlock holding). Our court later adopted the federal rule under Article I, section 9. State v. J. D. H. , 294 Or. App. 364, 371 n. 4, 432 P.3d 297 (2018) (so observing; citing representative cases). As Matlock explained, the common authority rule derives from the nature of the risks inherently assumed by co-use or co-occupancy:
"Common authority is, of course, not to be implied from the mere property interest a third party has in the property. * * * [It] rests rather on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched."
Matlock , 415 U.S. at 171 n. 7, 94 S.Ct. 988 ; accord. State v. Kurokawa-Lasciak , 249 Or. App. 435, 440, 278 P.3d 38, rev. den. , 352 Or. 378, 290 P.3d 814 (2012) (rationale for general rule, both under federal and state law, is that "one joint occupant of premises has for most purposes assumed the risk that another occupant might permit a search of those premises").[4]
But the general rule is just that: a general rule. Consistently with its rationale, the presumption of common authority gives way if co-occupants, instead of exercising joint access or control of the premises *624 for most purposes, *729 have a mutual understanding or agreement giving one of them exclusive authority over the premises or the portion searched. See generally Kurokawa-Lasciak , 249 Or. App. at 440-41, 278 P.3d 38 (stating principal and discussing representative cases). Likewise, the presumption gives way if, based on the co-occupants' respective relationships to the property, one of them has superior authority to control the premises and has not ceded control to the co-occupant. See, e.g. , State v. Voyles , 280 Or. App. 579, 586-87, 382 P.3d 583, rev. den. , 360 Or. 751, 388 P.3d 718 (2016) (person who boarded horses on another's property did not acquire authority co-equal to property owner's over commonly used portion of premises because property owner had not ceded such authority to boarder); State v. Wrenn , 150 Or. App. 96, 103-04, 945 P.2d 608 (1997) (homeless person permissively sleeping on couch for a few days lacked sufficient relationship to premises to have common authority to consent to search of kitchen area). And the United States Supreme Court has adopted a further exception, one not yet adopted under Article I, section 9 : If one joint occupant is physically present and objects to a search of the commonly used premises, police cannot rely on the consenting occupant; the objection of the co-occupant prevails. Georgia v. Randolph , 547 U.S. 103, 113-20, 126 S. Ct. 1515, 164 L.Ed. 2d 208 (2006) ; see also State v. Caster , 236 Or. App. 214, 220-25, 225 n. 4, 234 P.3d 1087, rev. den. , 349 Or. 479, 246 P.3d 744 (2010) (analyzing and applying rule under Fourth Amendment; no parallel argument advanced under Article I, section 9 ).
Finally, cases involving cohabitating "parents or other relatives pose unique problems" in the analysis. Carsey , 295 Or. at 42, 664 P.2d 1085. As Carsey explained, those problems
"stem[ ] from the fact that families ordinarily have common use of many household areas; that it is normal for the owner of a home to exercise control over all areas of the home, or if control is not actually exercised or is seldom exercised, that the right to exercise control over all areas exists; and that parents, by reason of the parent-child relationship, have a measure of control over all aspects of their children's lives, activities, effects, and living quarters."
Id . Thus, in the context of family members sharing a common household, competing considerations come into play, particularly where minor and dependent family members *730 are concerned. The shared use of most of the premises provides a basis to presume common authority for any family member to consent to a search, while the rights and responsibilities of the adults, either as property owners or parents or both, give rise to superior authority vís-á-vís minors residing in the household. The analysis of authority to consent in family households that include adults and minors therefore does not lend itself to per se rules. See, e.g. , Carsey , 295 Or. at 42, 664 P.2d 1085 (no per se rule that parents and grandparents have authority to consent to search of areas of home occupied by minor or dependent family members); State v. Will , 131 Or. App. 498, 505, 885 P.2d 715 (1994) (no per se rule that minors have common authority to permit police to enter the shared family home). Instead, the analysis is necessarily fact specific and depends significantly on the extent to which the adults in a family home, expressly or through some mutual understanding, have agreed to a minor's exercise of common or exclusive control over areas of the shared household. See, e.g. , Carsey , 295 Or. at 36, 42, 664 P.2d 1085 (grandparents had no authority to consent where they had an "unspoken agreement" that grandson could exercise exclusive control over his room); State v. Jenkins , 179 Or. App. 92, 101-02, 39 P.3d 868, rev. den. , 334 Or. 632, 54 P.3d 1042 (2002) (parents had no authority to consent where they had agreed that 18-year-old son had control over garage and they did not access it without son's permission); Will , 131 Or. App. at 505-06, 885 P.2d 715 (eight-year-old daughter could not consent to police entry where parents had never given daughter authority to permit others to enter residence).
Those legal precepts bring us to this case and its particular facts. As we described earlier, the juvenile court expressly found that youth's grandmother was "the owner of the property" and that she and youth were not in *625 a landlord-tenant relationship; instead, youth's grandmother was permissively "letting her grandson live in her home." The juvenile court further expressly found that the grandmother had "always" asserted her authority over the room that youth occupied, including her authority "to go in and out freely." Those findings are amply supported by the record, including the grandmother's specific testimony that she was emphatic in asserting her authority over youth's room, because it was *731 "her house"; that she in fact regularly went into youth's room, without his permission or the need for it; and that she exercised control over the room and its contents as she chose.[5] Although youth's grandmother was respectful of youth's privacy, she did not, at any time, give up her right to control the premises that youth occupied with her permission. As the prosecutor argued to the juvenile court at the hearing, youth's grandmother consistently maintained, in effect, that it was "her house, her rules." The juvenile court effectively so found, and youth does not challenge those findings.
The question remains, however, whether those facts support the legal conclusion that youth's grandmother had actual authority to consent to the search. See Beylund , 158 Or. App. at 416-17, 976 P.2d 1141 (authority to consent to search is a legal question). Under the common authority rule announced in Matlock , followed in Carsey , and later adopted by our court under Article I, section 9, the analysis of youth's grandmother's authority to consent to the search is straightforward. As we have described, the presumptive rule is that, when co-occupants have joint access to and use of most of the premises, each of the co-occupants has actual authority to consent to a search of the areas that they share. The facts of this case fall readily within that general rule and its rationale. Given the grandmother's insistence that she retained the authority to enter, clean up, and otherwise control youth's room, as well as the fact that she regularly exercised that control, youth assumed the risk that his grandmother might permit his room to be searched. See J. D. H. , 294 Or. App. at 365-66, 373-76, 432 P.3d 297 (mother who lived with 17-year-old son had common authority over son's room and contents where she considered herself to have shared control and in fact exercised unrestricted access to room for, among other things, cleaning room and collecting laundry). Under the circumstances here, at a minimum, the grandmother had common authority over access to youth's room, and she therefore had actual authority to consent to the search.
*732 In youth's view, however, the presumption of common authority does not apply in this case, on two alternative theories. First, youth urges that he had "exclusive" authority over his room because, in response to his grandmother's emphatic insistence that she could access his room at will, he had insisted just as emphatically that "it's his room." According to youth, the lack of a mutual agreement between him and his grandmother as to the scope of his grandmother's control over his room means that she had no authority to permit police to enter and search his room. That argument, however, turns the common-authority rule on its head. Under that rule, "when there is no evident agreement to the contrary, one co-occupant [of premises] is presumed to have completely assumed all risk that the other will consent to a search; the other has a full quantum of authority." Kurokawa-Lasciak , 249 Or. App. at 440, 278 P.3d 38. Contrary to youth's argument, then, the lack of a mutual agreement between youth and his grandmother limiting her access to youth's room precludes youth's assertion of "exclusive authority"; it does not support it.[6]
*626 Second, youth argues that, even if his grandmother had authority to consent to the search of his room, her authority could not be validly exercised to overcome youth's objection to the search. In support, youth relies on Randolph , where the Court announced, as an exception to the "common authority" rule under the Fourth Amendment, that the consent of one occupant to search common premises is not valid in the face of another physically present co-occupant's expressed objection to the search. 547 U.S. at 113-15, 126 S.Ct. 1515. In response, the state argues that Randolph announced a limited exception, one that does not extend to *733 minors living with a parent or other adult family members. In familial households, the state urges, a minor's refusal to consent to a search is ineffective to overcome the "superior" authority that a parent or other analogous adult family member holds over the household premises.
We agree with the state's understanding of Randolph and the limits of its holding. Randolph arose in the context of a husband-wife domestic dispute in which the wife consented to a search of the family home, while the husband, who was present, voiced his refusal. 547 U.S. at 106-07, 126 S.Ct. 1515. In concluding that the wife lacked authority to consent to the search over the husband's refusal, the Court distinguished Matlock , where one occupant consented to a search when the co-occupant was not present to object. Matlock 's common-authority rule, the Court explained, "is in significant part a function of commonly held understanding about the authority that co-inhabitants may exercise in ways that affect each other's interests." Id. at 111, 126 S. Ct. 1515. In particular, tenants who share quarters "understand that any one of them may admit visitors, with the consequence that a guest obnoxious to one may nevertheless be admitted in his absence by another." Id . (emphasis added). That same commonly held understanding is not necessarily at work, however, when consent by one tenant is subject to "immediate challenge by another." Id . at 113, 126 S. Ct. 1515. In many shared living situations, there is no "recognized superior authority among disagreeing tenants" to resolve disputes between them over access to and use of the common quarters. Id. at 114, 126 S. Ct. 1515. As the Court explained, "[u]nless the people living together fall within some recognized hierarchy, like a household of parent and child or barracks housing military personnel of different grades, there is no societal understanding of superior and inferior" and no basis on which "one co-tenant generally has a right or authority to prevail over the express wishes of another, whether the issue is the color of the curtains or invitations to outsiders." Id .
Randolph does not aid youth in this case. Randolph involved two adults whose relationship to each other and to the premises made them legal and social equals. In concluding that one co-occupant's consent to search could not *734 prevail in that circumstance over another's express objection, the Court distinguished situations in which people living together fall within some "recognized hierarchy" of authority. This case involves just such a hierarchy, however. Youth was living permissively with his grandmother in her home. Youth was not a tenant; his grandmother was not a landlord. Although youth shared his grandmother's home, he did not share it as a co-equal. She was a family elder, and the homeowner. Youth was a 16 year old, not an adult. Although his grandmother was respectful of his "space," she relinquished none of her rights to control the premises that youth occupied. To the contrary, she consistently made clear to youth that, while he lived in her home, he had to follow her rules, which included that she retained the unqualified right to have access to his room.
In short, although youth and his grandmother were family members living together in a common household, they were not co-equals in their relationship to the premises. The juvenile court concluded, and we *627 agree, that youth's grandmother had a superior right of access to and control over youth's room. To be sure, as youth argues, his grandmother was neither his parent nor a legal guardian with the rights and responsibilities attendant to parental or in loco parentis status. That fact did not render youth co-equal in authority or status to his grandmother, however. It meant only that his grandmother's authority did not derive from the "measure of control [that parents have] over all aspects of their children's lives, activities, effects, and living quarters ." Carsey , 295 Or. at 42, 664 P.2d 1085 (emphasis added). She was still the homeowner; she was still an elder in the family hierarchy; and youth was still a minor grandson residing with her on the condition that he abide by her rules. As Carsey observed, in cases involving "parents or other relatives" cohabitating with minors, "it is normal for the owner of a home to exercise control over all areas of the home, or if control is not actually exercised or is seldom exercised, that the right to exercise control over all areas exists." Id . That authority reflects not just property law concepts, but social mores as well. Unlike the disagreeing spouses in Randolph , when disagreeing common tenants are an adult family member who owns and provides the home and a minor, there is a societal *735 understanding of superior and inferior authority between the two. Pursuant to that societal understanding, in the absence of a mutual agreement to the contrary, an adult family member in a head-of-household role has the requisite authority to prevail over the disagreeing minor, whether the issue is, to borrow from Randolph , "the color of the curtains or invitations to outsiders." 547 U.S. at 114, 126 S.Ct. 1515.[7]
We therefore agree with the juvenile court's legal conclusion that youth's grandmother had superior authority to control access to youth's room. Consequently, under the Fourth Amendment, his grandmother's consent to search was valid, even though youth was physically present and expressly objected to the search.[8] Under the common-authority rule of both the Fourth Amendment and Article I, section 9, in the absence of "an evident agreement to the contrary," youth "completely assumed all risk" that his grandmother would consent to a search, with the result that his grandmother had a "full quantum of authority" to validly consent. Kurokawa-Lasciak , 249 Or. App. at 440, 278 P.3d 38. Here, there was no agreement that youth had exclusive authority over his room; to the contrary, youth's grandmother insisted that she retained unconstrained authority to access his room at her will. Youth's grandmother therefore had actual authority to consent to the search of youth's room, and the juvenile court correctly denied the motion to suppress.
Affirmed.

The record suggests that the two friends who were also in youth's room had been sleeping there on an ongoing basis of some kind. Neither paid the grandmother any form of rent. The record about their co-occupancy of youth's bedroom is otherwise undeveloped.

On appeal, under the Fourth Amendment to the United States Constitution, the state expands its argument by urging as an alternative ground for affirmance that, even if the grandmother did not have actual authority to consent, she had apparent authority. Youth disputes the state's ability to make that argument for the first time on appeal. Because we conclude that the grandmother had actual authority, we do not reach the parties' respective arguments on apparent authority to consent.

Article I, section 9, provides:
"No law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure; and no warrant shall issue but upon probable cause, supported by oath, or affirmation, and particularly describing the place to be searched, and the person or thing to be seized."
The Fourth Amendment provides:
"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

Our cases distinguish between the authority of co-occupants over premises and their authority over personal "effects," even when the effects are located within the common premises. See, e.g. , State v. Fuller , 158 Or. App. 501, 506, 976 P.2d 1137 (1999) (third-party "authority to consent to a search of an area is not necessarily co-extensive with authority to consent to a search of personal items within that area"). A third-party's authority to consent to a search of effects depends on the nature of the effect and whether it is used communally or exclusively by one occupant. Id . In this case, youth challenges only his grandmother's authority to permit police to enter and search his bedroom generally. Youth does not argue that the firearm, which was on an open entertainment shelf under a towel, was contained in a personal "effect" that required authority beyond that to search the bedroom generally. Nor does the record, viewed most favorably to the juvenile court's ruling, provide support for such an argument. Nothing suggests that items like furnishings, towels, and linens were youth's own, rather than provided by his grandmother. Indeed, the fact that the grandmother regarded items in the room as within her control and hers to pick up, clean, and otherwise access as she chose suggests those effects were communal.

Indeed, the record contains evidence of only one potentially "private" personal effect in the room: a safe. The grandmother testified, however, that she possessed the combination to the safe. The record thus supports an inference that nothing in youth's room was off-limits for his grandmother's inspection or otherwise beyond her right of access and control.

Youth relies on two decisions from our court that are inapposite, because neither involved the authority of cohabitants to consent to a search of commonly used or occupied premises . See Kurokawa-Lasciak , 249 Or. App. at 442, 278 P.3d 38 (girlfriend lacked authority to consent to search of boyfriend's van where boyfriend had given her keys only temporarily and had not given her permission to exercise significant control over the van); Fuller , 158 Or. App. at 506-07, 976 P.2d 1137 (girlfriend lacked authority to consent to boyfriend's personal property-a nightstand-in shared bedroom where boyfriend had not permitted or acquiesced in girlfriend's access to nightstand). As we earlier noted, the actual authority that extends to jointly occupied premises does not necessarily apply to personal effects, even when the effects are located within the common premises. See 296 Or. App. at 728 n. 4. This case, however, involves only a challenge to the search of youth's bedroom. Id .

Youth does not cite any case extending Randolph to an analogous set of facts, nor have we found any. The considered authority appears uniformly contrary to youth's position. LaFave, for example, draws the distinction between the situation in Randolph where "two or more persons have equal use of a place in which both are present," and one where, as here, "one's privacy while present someplace is derivative of and dependent on the privacy of another." Wayne R. LaFave, 4 Search and Seizure § 8.3(d), 213 (5th ed. 2012) (internal quotation marks and citation omitted). When minors live with parents and other heads of households, LaFave comments that "it makes sense that the individual with the predominant interest should prevail. Thus, if that individual were to consent to the search, the search could be conducted notwithstanding the present objection of a person with a lesser interest." Id. ; see also id. at 213-14 nn. 79-81 (citing representative cases and authorities).

Youth asks us to adopt the Randolph "disagreeing tenants" exception to the common authority rule under Article I, section 9. We decline to consider whether we should do so because, as we have explained, Randolph 's exception and the rationale for it do not extend to these factual circumstances and would not yield a different result in this case.