Argued and submitted June 26, 2019, reversed and remanded June 17, 2020

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

LUIS ARMANDO SOLORIO,
aka Luis Solorio, aka Luis A. Solorio,
*Defendant-Appellant.*

Multnomah County Circuit Court
16CR66095; A165679

468 P3d 522

Defendant appeals a judgment of conviction for felon in possession of a firearm, ORS 166.270(1). He assigns error to the trial court's denial of his motion to suppress evidence obtained during a warrantless search and subsequent seizure of his personal effects, from a safe within his vehicle, in violation of Article I, section 9, of the Oregon Constitution and the Fourth Amendment to the United States Constitution. The state concedes that the trial court erred in relying on the search incident to arrest and officer safety exception. However, the state asserts that the trial court did not err because the police received consent from a third-party who had actual authority to consent. *Held*: The trial court erred in denying defendant's motion to suppress. The search and subsequent seizure were unlawful because the third party did not have actual authority to consent to a search. The Court of Appeals also accepted the state's concession that the search incident to arrest and officer safety exception would not apply.

Reversed and remanded.

Karin Johana Immergut, Judge.

Sara F. Werboff, Deputy Public Defender, argued the cause for appellant. Also on the brief was Ernest G. Lannet, Chief Defender, Criminal Appellate Section, Office of Public Defense Services.

Christopher A. Perdue, Assistant Attorney General, argued the cause for respondent. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Aoyagi, Presiding Judge, and Egan, Chief Judge, and Mooney, Judge.*

_____
 * Egan, C. J., *vice* Hadlock, J. pro tempore.

EGAN, C. J.

Reversed and remanded.

**EGAN, C. J.**

Defendant appeals a judgment of conviction for felon in possession of a firearm. ORS 166.270(1). On appeal, defendant argues that the trial court erred in its denial of his motion to suppress evidence obtained during a search and subsequent seizure of his personal effects in violation of Article I, section 9, of the Oregon Constitution and the Fourth Amendment to the United States Constitution. We agree with defendant and reverse and remand.

In reviewing the denial of a motion to suppress, "we are bound by a trial court's factual findings, if the record contains evidence to support them." *State v. Serrano* 346 Or 311, 326, 210 P3d 892 (2009). If the trial court failed to articulate a factual finding on a pertinent issue, we assume that the trial court decided the facts "in a manner consistent with the court's ultimate conclusions, as long as there is evidence in the record, and inferences that reasonably may be drawn from that evidence," that would support its conclusion. *State v. Juarez-Godinez*, 326 Or 1, 7, 942 P2d 772 (1997).

While defendant was in jail, two police officers, Thurman and Roberts, responded to a call about a suspicious van parked in a cul-de-sac near the Springwater Corridor in Portland. According to Roberts, the location is generally an "unsafe" area, where there have been drug-related shootings, parties, and overdoses. Thurman viewed the cul-de-sac itself as "a little dangerous," because there is only one way in and out, which eliminates the element of surprise for police officers.

Thurman arrived at the location first and approached a van that had all of its doors open. A male, Siri, was sitting in the driver's seat, and a female, Seagrest, was in the back seat. On the floor, beneath the driver's seat, Thurman was able to see a syringe. Thurman asked who the vehicle belonged to, and Siri replied, "Dawson." Siri also stated that Dawson had just left. Roberts arrived at the scene at about that time, and Thurman walked away to run Siri and Seagrest's names through dispatch.

Roberts came to the passenger side of the vehicle and observed a syringe with a brown substance in it, small plastic bags, and a scale with a brown substance on it. Given his training and experience, he suspected the brown substance to be heroin. Due to his observations of the syringe and scale, Roberts read Siri and Seagrest their *Miranda* rights, told them they were not free to leave, and began investigating drug-related offenses. Siri told Roberts that Dawson "had lost the key to the van" and had asked him to safeguard the van while she was gone. After that conversation, and because Siri was in the driver's seat, Roberts concluded that Siri was "in control of the van." Roberts asked Siri for consent to search the van and a small safe that Roberts observed inside the van. Siri consented to both. When asked about the safe, Siri told Roberts that, "[i]t's not my safe"; however, "[y]ou can go into it."

Roberts asked Siri and Seagrest to exit the van, so that he could search it. They did. Before searching the van, Roberts searched Siri and Seagrest. At the suppression hearing, Roberts testified that he wanted to take Siri and Seagrest out of the van to search them for firearms. However, when Roberts was asked about whether he had safety concerns, he replied that he "may not" have had any. He further clarified that "I am always to some degree concerned when I am dealing with the unknown, because there were drugs in the car." But, as to Siri and Seagrest specifically, "at no point did either one of them make any kind of a furtive movement or act in such a way that made me hyper-concerned more so than I already would be." Roberts did not find any weapons on either Siri or Seagrest.

After searching Siri and Seagrest, Roberts searched the safe, which was unlocked. Roberts opened it and found a firearm inside. Roberts did not remove the firearm from the safe immediately after seeing it. Instead, he continued searching the vehicle. While Roberts was searching the vehicle, and Thurman was running names through dispatch, Dawson arrived.

As Dawson approached, she called out to the officers "[t]hat's my van." Roberts asked if she had left Siri and Seagrest "in control of the van." She replied, "yes they were allowed to be in there" and that "I asked them to watch the van for me. So[,] they had control of the van." Roberts also asked Dawson if he could have her permission to search the vehicle and the safe. She replied, "that's fine." Roberts talked to Dawson about his discussion with Siri and Seagrest, and he told her that they "gave [him] permission to go into the safe." He also told her that he had "looked inside of the safe" and that he was "concerned with what [he] saw." He then asked, do "[y]ou want to tell me what's going on with [the firearm]?" Dawson replied, "The safe is the property of my boyfriend, *** there's a gun in there, and there's some fake drugs *** in the bottom." She added that her boyfriend, defendant, had "been in jail for about a week now in Clackamas County." Dawson gave Roberts permission to open the safe to retrieve the gun. However, the safe had locked automatically after the first time he had opened it. Dawson claimed she had "the passcode" to the safe and "attempted several different combinations to get into it and none of those worked." Because none of those combinations worked, Roberts "pried it open." Inside the safe was a gun, ammunition, heroin, and drug paraphernalia.

Roberts later talked to defendant in jail. Defendant stated that the van was shared with his girlfriend, Dawson, but that the gun inside the safe was his property. Defendant was charged with felon in possession of a firearm under ORS 166.270(1).

Defendant moved to suppress his statements and the physical evidence that had been seized. The trial court denied the motion on three grounds—that the search of the safe was justified as a search incident to arrest, that it was justified on officer safety grounds, and that it was a consent search. As to the first rationale, defendant argued that, because Siri and Seagrest were not subjected to an arrest, the search incident to arrest exception did not apply. The trial court concluded, however, that Siri and Seagrest

were "effectively arrested" because they were removed from the van, they were not free to leave, they were given their *Miranda* warnings, they were being blocked from leaving the premises, and "the parties could see that [the officers] had probable cause to arrest" them.

Defendant next argued that the officer safety exception did not apply because the officer's safety concern was only generalized, and that the officer did not have subjective and objective suspicion of imminent physical injury. The trial court concluded that the exception applied because it "was a high crime area, a drug area, drugs and guns *** go hand in hand," the vehicle was suspicious with "what appeared to be *** drug trafficking" inside, and that there could be people in that area and that "they didn't know who was around[.]"

Finally, defendant argued that none of the people who consented to the search of the safe had actual authority to do so. The trial court ruled that Siri, Seagrest, and Dawson all had actual authority to consent to a search of the van. For Siri and Seagrest, the court reasoned that, because the safe was unlocked and because they had control of the van, given by Dawson or through an "agency theory," they had actual authority to consent to a search. As to Dawson, the court found that defendant "gave complete control over the van and all [of] its contents" to Dawson. The trial court reasoned that, because Dawson was

> "familiar with what was in the closed containers, that it was within her right as a co-owner of the car and the contents of the car under the circumstances of this case, [that] there is no expectation of *** privacy *** [because] Dawson had complete control over the car."

After the motion was denied, the parties agreed to a stipulated-facts bench trial. The trial court found defendant guilty of felon in possession, and this appeal followed.

To support his sole assignment of error, defendant challenges the trial court's three justifications for the denial of his motion to suppress. On appeal, the state does not defend

the trial court's first[1] and second[2] grounds for denial of his motion, and we agree that the trial court erred in relying on the search-incident-to-arrest and officer-safety exceptions to the warrant requirement. Therefore, we address only the third justification for the trial court's ruling. In support of defendant's position that the police lacked valid consent, because no one with actual authority had consented to the search of the safe, he makes three arguments. First, he argues that Siri and Seagrest did not have actual authority to consent to a search of the safe, either given by Dawson or through an agency theory. Second, he argues that any lawful searches that might have happened were fruits of an unlawful search, namely Roberts' original search of the safe with consent by Seagrest. Third, he argues that Dawson did not have actual authority to consent to a search of the safe. The state argues that Dawson had joint access to the safe and that she properly delegated her right of access to Siri and Seagrest by her. For the reasons explained below, we agree with defendant.

"We defer to the trial court's express and implicit findings of fact, but whether those facts support a conclusion that the consenting person had authority is a legal question." *State v. Kurokawa-Lasciak*, 249 Or App 435, 440, 278 P3d

---

[1] There is no evidence in the record that either Siri or Seagrest were subject to a "custodial arrest," as required under the Fourth Amendment to the United States Constitution to support a search incident to arrest. *See Knowles v. Iowa*, 525 US 113, 119, 119 S Ct 484, 142 L Ed 2d 492 (1998) (probable cause to arrest does not provide ground for a search incident to arrest if no custodial arrest occurs); *United State v. Robinson*, 414 US 218, 235, 94 S Ct 467, 38 L Ed 2d 427 (1973) (requiring a custodial arrest for a search incident to arrest). The state does not argue on appeal that the trial court was correct in its conclusion that the search at issue here was justified as a search incident to arrest. "Because we conclude that defendant's Fourth Amendment rights were violated, it is unnecessary for us to consider whether *** defendant is entitled to greater protection under Article I, section 9, of the Oregon Constitution." *State v. Caster*, 236 Or App 214, 225 n 4, 234 P3d 1087, *rev den*, 349 Or 479 (2010).

[2] The officers testified about, and the trial court found, only generalized concerns regarding the officers' safety, which is insufficient under Article I, section 9, to allow a search under the officer safety exception. *State v. Powell*, 288 Or App 660, 665-66, 406 P3d 1111, *rev den*, 362 Or 508 (2017) (holding that the officer's safety concerns "must be based on facts specific to the particular person searched, not on intuition or a generalized fear that the person may pose a threat to the officer's safety or the safety of others nearby" (internal quotation marks omitted)).

38, *rev den*, 352 Or 378 (2012) (citing *State v. Beylund*, 158 Or App 410, 417, 976 P2d 1141, *rev den*, 328 Or 594 (1999)).

Under Article I, section 9,[3] a warrantless search is *per se* unreasonable unless it falls within one of the limited exceptions to the warrant requirement.[4] *State v. Bridewell*, 306 Or 231, 235, 759 P2d 1054 (1988). Consent is an exception to the warrant requirement, but consent may be given only by a person with actual authority to consent. *State v. Bonilla*, 358 Or 475, 480-81, 366 P3d 331 (2015) ("[T]o satisfy the requirements of the consent exception under Article I, section 9, consent must be given by a person with *actual authority* to give it." (Emphasis added.)). In determining whether a third-party's consent is valid, we measure the relationship of the third party to the premises or the things searched. *State v. Lambert*, 134 Or App 148, 152, 894 P2d 1189 (1995). A third party must have common authority as shown by that person's "joint use or occupancy of the premises" to validly authorize a search. *State v. Jenkins*, 179 Or App 92, 100, 39 P3d 868, *rev den*, 334 Or 632 (2002) (internal quotation marks omitted). It is the state's burden to show that the third party had actual authority to consent to the search. *City of Portland v. Paulson*, 98 Or App 328, 330, 779 P2d 188 (1989).

We first consider whether Dawson had actual authority to consent to a search, as any authority that Siri and Seagrest had would have been derived from Dawson's actual authority. Defendant does not dispute the trial court's finding that Dawson had actual authority over the van, and we agree that Dawson was a joint occupant of the van and had actual authority over it.[5] However, even if a

---

[3] Article I, section 9, provides:

"No law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure; and no warrant shall issue but upon probable cause, supported by oath, or affirmation, and particularly describing the place to be searched, and the person or thing to be seized."

[4] Because we conclude that defendant's Article I, section 9 rights were violated, we do not address his arguments made under the Fourth Amendment.

[5] The following facts support a determination that Dawson had actual authority to consent to a search of the van. When Dawson approached the van, she called out to the officers, "[t]hat's my van." Siri and Seagrest also both told Roberts that Dawson was the owner. And, although defendant actually owns the van, he told Roberts that he "shared [the van] with his girlfriend."

person is a joint occupant, one party's ability to authorize a search of items within a shared vehicle may be limited. *See Kurokawa-Lasciak*, 249 Or App at 442.

Because Dawson had actual authority to consent to a search of the van, we next discuss whether Dawson had actual authority to consent to the search of the safe that was inside the van. "Central to search and seizure law is whether an individual has, in some way, assumed the risk that a third party may legally consent to a search of that individual's property." *State v. Fuller*, 158 Or App 501, 506, 976 P2d 1137 (1999) (citing *State v. Rohrbach*, 93 Or App 608, 611, 763 P2d 196 (1988)). Therefore, authority to consent to a search of an area is not necessarily coextensive with authority to consent to a search of personal items within that area. *Fuller*, 158 Or App at 506; *see State v. Edgell*, 153 Or App 108, 112, 956 P2d 988 (1998) (holding that the authority to consent to a search of a vehicle does not automatically permit a search of personal effects within that car); *see also Kurokawa-Lasciak*, 249 Or App at 442 (opining that whether the girlfriend of the defendant can consent to a search of the van depends on whether there was "an understanding" of common access). As a matter of law, actual authority over a personal item requires "permission or acquiescence" by the defendant for the third party to exercise control over that personal item. *Fuller*, 158 Or App at 507. That is, there must be evidence that the defendant at least knew that the third party was exercising control over the defendant's personal property and that the defendant did not object to the third party exercising control over the defendant's personal property. *See id.* (concluding that there was "no evidence that defendant *knew* that [defendant's girlfriend] was getting into his nightstand, much less that he explicitly authorized or even implicitly acquiesced in that conduct" (emphasis added)).

There is insufficient evidence to support the trial court's finding that defendant "gave complete control over" the safe to Dawson. The court's reasoning to support its determination that Dawson had actual authority over the safe was that (1) she was "familiar with what was in the closed containers," (2) defendant had no control over the safe, because he was in jail, and (3) it was "within [Dawson's] right

as a co-owner of the car and the contents." Furthermore, there is evidence in the record that Dawson claimed that she had "the passcode" to the safe. However, when she attempted to open the safe, she could not. None of that evidence shows permission or acquiescence by defendant for Dawson to exercise control over the safe. At best, it allows an inference that Dawson had *accessed* the safe. For instance, there is no evidence that defendant gave Dawson permission to enter the safe or that Dawson had ever opened it.[6] Furthermore, unlike in *Fuller*, where the defendant's girlfriend occasionally used the nightstand, there is no evidence to support a finding that Dawson ever entered or used the safe before her unsuccessful attempts to open the safe under the supervision of the officer. That evidence is insufficient to establish that Dawson had actual authority to consent to a search of the safe.

Similarly, the fact that the safe was unlocked does not create an inference that Dawson had actual authority to consent to a search of the safe.[7] Because the court determined that Siri and Seagrest had actual authority over the safe, either given by Dawson or through an agency theory, it must have reasoned that that authority came from Dawson. However, personal property being "unlocked does not, in and of itself, allow an inference" that a third party had actually authority to exercise control over the personal property. *Fuller*, 158 Or App at 506-07. Instead, there must be evidence of either "permission or acquiescence" by the defendant to the third party. *Id*. at 507. As stated before, there is no evidence in the record to support a finding that Dawson had permission or acquiescence from defendant to enter the safe. Therefore, the fact that the safe was unlocked is insufficient to show that Dawson had actual authority to exercise control over the safe.

The evidence that is closest to allowing an inference that Dawson had permission or acquiescence to exercise

---

[6] Evidence that Dawson knew the contents of the safe is not necessarily evidence that she accessed the safe. For instance, Dawson could have seen the contents of the safe when defendant opened it.

[7] The trial court found, in part, that Siri and Seagrest had actual authority over the safe because it was unlocked when Roberts first opened it.

control over the safe is that Dawson attempted to open the safe for the officer. Dawson's acts of telling the officer that she had the combination to the safe, and subsequently attempting to open the safe, allows an inference that Dawson at least once knew the combination to the safe. We assume for the sake of argument that Dawson did have a combination to the safe, one that at least had been valid at some point in time. However, having a means of access, such as a key, in and of itself, does not show an agreement or understanding between a defendant and a third party. *See Jenkins*, 179 Or App at 102 (finding that parents did not have actual authority to search a garage that the defendant lived in attached to their house, even though they had access to an emergency key). Instead, when evaluating third-party consent, we consider the relationship of the third party to the premises or the things searched. *See Fuller*, 158 Or App at 505. In determining whether there is a sufficient relationship to create joint access, it is the state's burden to show that the third party has more than mere access. *Id*. at 505-07 (finding that occasional access to the nightstand without the defendant's knowledge is insufficient to show actual authority); *Paulson*, 98 Or App at 331 (holding that an officer's testimony that the third party told him that she had lived at the residence was insufficient to show joint authority). Nothing in the record here indicates that defendant gave Dawson permission to use the combination, that defendant knew that she had the combination, or whether it was defendant that had given her the combination. In essence, there is no evidence of an agreement or understanding between Dawson and defendant about access to the safe. For that reason, the evidence was not legally sufficient to show that Dawson had actual authority to consent to a search of the safe.

The state argues that, when a joint occupant has actual authority over an area, they are "presumed to have completely assumed all risk that the other will consent to a search" unless there is an agreement otherwise. In making that argument, the state heavily relies on *Kurokawa-Lasciak*. However, the main principles of that case do not support the state's assertion. Instead, the case states that whether a third party could consent to a search of a particular item hinges on what understanding or agreement the

people involved had formed. *Kurokawa-Lasciak*, 249 Or App at 440-44 (holding that the agreement between the defendant and his girlfriend had "strict limitations" and that the agreement did not extend past "extracting the family dog, locking the van, and keeping it locked"). As previously stated, there is no evidence to support that defendant and Dawson had an understanding or agreement for her to exercise control over the safe.

To be sure, *Kurokawa-Lasciak* does discuss a presumption of a "full quantum of authority" given to a third party. *Id.* at 440. However, in no case has the presumption extended beyond the understanding or agreement between the people involved. For instance, in *Beylund*, the third party consented to a search of the defendant's basement where marijuana plants were growing. 158 Or App at 418. The court found that the third party had "full access" to the house, including the basement, because the third party rented upstairs and was allowed to pay his rent by "tending defendant's marijuana plants" that were in the basement. *Id.*

In another example, a house sitter was given full actual authority over a house, including a locked freezer, because of a note that provided the sitter with "*complete control* of [the] household and *everything pertaining to it.*" *State v. Surface/Hurley*, 183 Or App 368, 374-75, 51 P3d 713 (2002) (bracket in original; internal quotation marks omitted; emphasis added). In both of those cases, there was evidence in the record that the understanding or agreement between the defendant and the third party was that the third party could have access to the whole house, including the personal property inside. Here, however, there is no evidence that there was an understanding or agreement between Dawson and defendant that Dawson could exercise control over the safe. Similarly, there is no evidence that they had an understanding or agreement that Dawson had a "full quantum of authority" to exercise control over all the contents of the van.[8]

---

[8] Because there was no lawful consent by Siri, Seagrest, or Dawson, we do not discuss defendant's second argument, which is that any search of the safe after either Siri or Seagrest consented to a search, was tainted by the previous unlawful search.

Because Dawson did not have authority to consent to a search, logically, Siri and Seagrest could not have authority as agents of Dawson. Authority to consent to a search "must be given by (or lawfully on behalf of) the person who holds the protected privacy interest." *Bonilla,* 358 Or at 486. Therefore, Dawson could not give Siri or Seagrest actual authority to consent to a search of the safe, either through an agency theory or otherwise, because the agent's authority cannot exceed the scope of the actual authority of the principal.[9]

Because Dawson lacked actual authority to consent to a search of defendant's safe, the trial court erred in denying defendant's motion to suppress.

Reversed and remanded.

---

[9] *Bonilla* keeps open the possibility that there may be some type of common-law authority to consent to a search as an agent. 358 Or at 486 nn 7 & 8 (noting that "third person authority could be derived from an actual agency relationship" as discussed in a case from the Fourth Circuit Court of Appeals (quoting *United States v. Block*, 590 F2d 535, 539 n 5 (4th Cir 1978))). However, the agency principle at issue here is "based on joint access and control over [the] property" *Bonilla*, 358 Or at 486 n 8 (citing *State v. Carsey*, 295 Or 32, 44-45, 664 P2d 1085 (1983)), not any other agency theory.